**[J-63-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 716 CAP |
| | : | |
| Appellee | : | Appeal from the Judgment of Sentence |
| | : | entered on 3/6/2007 in the Court of |
| | : | Common Pleas, Lehigh County, |
| v. | : | Criminal Division at No. CP-39-CR- |
| | : | 0003637-2003. |
| | : | |
| JUNIUS BURNO, | : | ARGUED: May 11, 2016 |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE WECHT**                                    **DECIDED: February 22, 2017**

On March 6, 2007, Junius Burno was convicted on two counts of first-degree murder, 18 Pa.C.S. § 2502(a), and sentenced to death. In this direct appeal from the Court of Common Pleas of Lehigh County, Burno challenges the admissibility of his confession to the murders, the sufficiency of the evidence, the alleged denial of his right to a speedy trial, and the admissibility of certain evidence establishing an aggravating factor for purposes of the death penalty. We reject all but one of these challenges on the merits. We find merit to Burno's argument that one of his statements to police was inadmissible because it was obtained during the course of plea negotiations. However, we ultimately conclude that the erroneous admission of this statement at trial was harmless. Consequently, we affirm Burno's death sentence.

On April 13, 2003, two men entered an apartment in Allentown, Pennsylvania and proceeded to shoot and kill Carlos Juarbe and Oscar Rosado. The investigation

that followed eventually led the Allentown Police to arrest Terrance Bethea for the murders. Soon thereafter, Bethea implicated Burno in the shootings. On September 12, 2003, Burno surrendered to the police and was arrested. Burno elected not to speak with the police about the murders without counsel. Burno then retained the services of Glennis Clark, Esquire. In the weeks that followed, Burno provided the police with multiple inculpatory statements regarding the murders.

Attorney Clark arranged a September 24, 2003 meeting with the police and assistant district attorney ("ADA") Maria Dantos. On that date, Burno and Attorney Clark met with Detective Wayne Simock, Detective John Miller, and ADA Dantos in the law library of the Lehigh County District Attorney's Office. At the inception of the meeting, Detective Simock and ADA Dantos detailed the rules applicable to Burno's cooperation. Specifically, ADA Dantos explained to Attorney Clark and to Burno that Burno was required to tell the truth about what had happened on April 13, 2003, and would need to testify against Bethea at Bethea's preliminary hearing and trial. In exchange, ADA Dantos promised that she would not seek the death penalty against Burno. However, if the negotiations fell through or broke down for any reason, any statements that Burno had made would be used against him at a future trial. Burno and Attorney Clark both agreed to these terms. Burno then spoke about the murders for approximately two hours. The conversation was not recorded.

During this conversation, Burno identified the locations of the two guns that he and Bethea used during the murders. Detectives Simock and Miller then took Burno to the police station to record his statement. On the way, they stopped to retrieve the secreted guns. Once at the police station, Detective Simock provided Burno with Miranda[1] warnings. Burno then repeated his statement, which was tape-recorded. In

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

this statement, Burno claimed that he drove Bethea to Juarbe's apartment to trade guns for drugs, but asserted that Bethea was the only person to enter the apartment. Burno stated that he remained in the car at all times.

The police and ADA Dantos did not believe Burno's statement. ADA Dantos conferred with Attorney Clark about these suspicions. ADA Dantos and Attorney Clark agreed that, in order to test the veracity of his statement, Burno should submit to a polygraph test. On September 26, 2003, police officer Keith Morris met with Burno, provided Miranda warnings, and administered the polygraph test. Although he had known about the polygraph examination and consented to it, Attorney Clark was not present for the examination itself. Typically, at the end of a polygraph examination, Officer Morris would take some time and review the results. However, Officer Morris did not find that necessary in this case inasmuch as he detected immediately that Burno's statement was not truthful. Officer Morris then informed Burno that he had failed the polygraph test. Burno stared at Officer Morris, and stated that no one could save him at that point. Officer Morris responded by telling Burno that he did not believe that no one could save him. Officer Morris then told Burno that, generally, telling the truth is a way that a person in his position could help himself.

After pondering Officer Morris' statement briefly, Burno asked to speak with Attorney Clark. However, Attorney Clark was unavailable at that time. After being advised of the results, ADA Dantos proceeded to the interview room to inform Burno, who was crying and upset, that authorities were attempting to contact his attorney. Burno apologized to ADA Dantos for lying, and expressed remorse for his actions. ADA Dantos reminded Burno that, because he was not truthful, the parties no longer had a deal to forego the death penalty. ADA Dantos explained to Burno, however, that if he was truthful from that point on, the parties could recommence plea discussions. She

emphasized that he had to tell the truth and that, at that point, there was no deal on the table. Hearing that, Burno told ADA Dantos that he was remorseful and that he would have to face the consequences for his crimes.

Eventually, ADA Dantos was able to reach Attorney Clark by telephone. Attorney Clark then spoke with Burno over the phone. Attorney Clark agreed to come to the police station, but could not get there for some time. Nevertheless, Attorney Clark authorized the police to commence discussions with Burno before he arrived, in part because he believed that Burno could not do any more damage than he already had done by lying.

Burno met with Detective Simock and Detective Joseph Effting, even though Attorney Clark had not yet arrived at the police station. The detectives once again provided Burno with Miranda warnings. In the ensuing statement, Burno admitted that he and Bethea went to Juarbe's residence, knowing that Juarbe was a drug dealer, and intending to rob Juarbe to settle a dispute that Bethea had with Juarbe. Burno admitted that he got into a scuffle with Rosado, and then shot him with a nine millimeter handgun. After Burno provided additional details surrounding the murders, Attorney Clark arrived at the station and knocked on the door of the interview room.

Once Attorney Clark was seated and had spoken to Burno, Detectives Simock and Effting continued the interview. Much of this portion of the interview involved reviewing parts of what Burno had stated before Attorney Clark arrived. Among other points, Burno again admitted that he had participated in the murders.

At the conclusion of the interview, Detective Simock reminded Burno that, for the authorities to consider taking the death penalty off the table, Burno's statement had to be truthful and Burno had to testify against Bethea. However, on October 28, 2003, the day before Bethea's preliminary hearing, Burno informed Detective Simock and ADA

Dantos that he no longer was willing to cooperate in the prosecution of Bethea. In addition to removing the death penalty from consideration, Burno wanted his homicide charges reduced to third-degree. ADA Dantos would not make that deal, and, in light of Burno's decision not to cooperate, indicated to Burno and Attorney Clark that there would be no agreement. She informed them that she would be seeking the death penalty against Burno.

Prior to trial, Burno filed numerous motions to suppress the statements that he provided to the police. Among his claims for relief, Burno maintained that: (1) the warrant for his arrest lacked probable cause, and any resulting statements were fruit of the poisonous tree; (2) his statements were coerced by Officer Miller during the polygraph examination; (3) his statements were inadmissible because they were made during the process of plea negotiation; and (4) the September 26, 2003 statements were involuntary because Attorney Clark was not present for the first portion of the statement, and the second portion of the statement was tainted unconstitutionally by Attorney Clark's absence during the first part. After an evidentiary hearing, and in two separate orders, the trial court denied Burno's motions to suppress his statements on all points except the argument relative to the first portion of the September 26, 2003 tape-recorded confession. Because Attorney Clark was not present for that part of the statement, the trial court suppressed that portion of the statement. However, because Attorney Clark arrived for the second portion, the court ruled that portion to be admissible.

Because of ADA Dantos' involvement in obtaining Burno's confessions, and believing that she might be a material witness at trial concerning the voluntariness of the confessions, Burno filed a pre-trial motion for the assignment of a new prosecuting attorney. On April 18, 2005, the trial court granted the motion in part, relegating ADA

Dantos to serve as second chair at Burno's trial instead of as the lead prosecutor. The Commonwealth filed a motion seeking reconsideration, which the trial court denied. On April 21, 2005, the Commonwealth filed a notice of appeal from the order denying its motion for reconsideration.

In its notice of appeal, the Commonwealth did not expressly invoke Pa.R.A.P. 313, which governs appeals of collateral orders. Nonetheless, the Commonwealth set forth the terms of the rule and explained that the order was "separable and collateral to the main cause of action, the right involved is too important to be denied review, and the question presented is such that if review is postponed until final judgment, the claim will be irreparably lost." See Notice of Appeal, 4/21/2005, ¶2. Notably, the Commonwealth did not certify that the order terminated or substantially handicapped its prosecution pursuant to Pa.R.A.P. 311(d).

In the interim, both parties sought permission to file an interlocutory appeal, contending that the issue involved a controlling issue of law upon which a substantial basis for difference of opinion existed. See 42 Pa.C.S. § 702(b). The trial court granted permission to both parties.[2] However, the Superior Court denied permission to appeal upon that basis. See Commonwealth v. Burno, Nos. 39 and 47 EDM 2005 (July 6, 2005) (*per curiam*).

The Superior Court accepted the Commonwealth's earlier appeal from the denial of the motion for reconsideration. In an unpublished memorandum, the court reversed the trial court's decision. See Commonwealth v. Burno, No. 1084 EDA 2005, slip op. at 1, 6 (Pa. Super. Apr. 21, 2006). The Superior Court alluded briefly to the requests for

---

[2] The trial court permitted the parties to file interlocutory appeals pertaining only to the order requiring ADA Dantos to take a back seat in the prosecution. The trial court denied Burno's request to file an interlocutory appeal to challenge the denial of his motion to suppress all of his statements.

permission to file interlocutory appeals, but never explained the basis for its jurisdiction. Id. at 3 n.4. On the merits, the court held that, because it was Burno and not the Commonwealth who would call ADA Dantos as a witness at trial, the trial court erred in forcing ADA Dantos to serve as second (instead of first) chair in the prosecution. Id. at 6 (citing Commonwealth v. Willis, 552 A.2d 682, 696 (Pa. Super. 1988) (recognizing an exception to the general rule that an attorney cannot prosecute a case and be a material witness in the same proceeding when it is the other party that is calling the attorney as a witness)).

The appeal delayed the proceedings for one year. Burno filed a pre-trial motion to dismiss the charges against him pursuant to Pa.R.Crim.P. 600, alleging that he was denied his right to a speedy trial because the Commonwealth's appeal lacked a jurisdictional basis. Burno maintained that, because the Commonwealth did not demonstrate that the trial court's order was, in fact, a collateral order, and did not certify that the appeal terminated or substantially handicapped the prosecution pursuant to Pa.R.A.P. 311, the Superior Court never had jurisdiction to rule upon the appeal. Because the Commonwealth did not perfect jurisdiction, it had no right to appeal, and, therefore, did not act with due diligence so as to justify the delay. Following an evidentiary hearing, the trial court denied the motion.

The Commonwealth tried Burno before a jury from February 26 to March 5, 2007. In an earlier appeal, this Court provided the following thorough summary of the facts presented at Burno's trial:

> On April 13, 2003, Mary Meixell Moyer telephoned the police complaining [that] she heard gunshots fired next door at 2628 South 4th Street in Allentown. Upon arriving at the scene, Allentown Police Officer Scott Derr discovered blood on the residence's front steps and on the back of a sign located on the porch. The front door of the residence was ajar, and the inside lights were on when Officer Derr entered the residence to perform a security check. Officer Derr discovered two homicide victims inside the residence and obvious signs that a struggle had taken place within the

residence. One of the victims was found lying on his back in the doorway leading to the bedroom, while the other victim was found in the back of the bedroom curled up in a fetal position. Officer Derr secured the scene and waited for detectives from the Criminal Investigation Division to arrive.

Subsequently, the first victim, who was found in the bedroom doorway, was identified as Carlos Juarbe, the lessee of the residence, and the second victim was identified as his friend, Oscar Rosado. Detectives processed the scene and spoke to witnesses. Specifically, when questioned, Ms. Moyer informed the police that, immediately after hearing gunshots, she saw two men flee the area in a red or maroon compact car with its headlights turned off. The detectives found a trail of blood leading from Juarbe's apartment to the spot where Ms. Moyer saw the car drive away from the area. The detectives recovered various blood samples, shell casings from a nine-millimeter Luger, both jacketed and unjacketed lead projectiles, and a sawed-off 12-gauge double barreled shotgun containing one live shell and one spent shell of bird shot.

The blood evidence, which the detectives recovered from the scene, led police to Terrance Bethea, who the police arrested on September 12, 2003, and charged him with murder. [The investigation led the police to believe that Burno participated in the murders with Bethea].

Later, on the same day, police interviewed Bethea's wife, who informed them that Burno and Bethea arrived together at her house during the early morning hours of April 13, 2003, and Bethea had a shotgun wound. Neither Burno nor Bethea would tell her how or why Bethea was shot. All three proceeded to a hospital in Philadelphia to seek medical treatment for Bethea, and while at the hospital, Bethea gave hospital personnel, and subsequently the police, a false name, false birth date, and false information about how he had been shot.

Thereafter, Detectives Simock and Miller contacted the Lansford Police Department, and based upon information provided by that Department, the detectives determined that Burno owned a car, which matched Ms. Moyer's description of the vehicle that fled the scene of the double homicide. On the evening of September 12, 2003, Burno turned himself into the Allentown Police Department, and he was arrested. The next day, the Commonwealth filed a criminal complaint charging Burno with, *inter alia*, two counts of criminal homicide, and thereafter, the Commonwealth gave timely notice of its intention to seek the death penalty.

Subsequently, Burno gave several conflicting statements to the police. For instance, he initially gave the police a statement claiming he and Bethea were innocent bystanders who were visiting Juarbe when two armed intruders entered the residence, and Bethea was shot when he got caught in the crossfire between Juarbe and the intruders. However, on

September 24, 2003, Burno gave the police a taped statement in which he admitted to some involvement with the crime. Burno explained during the taped statement that, some months prior to the killings, Bethea had informed him that he obtained two handguns when he burglarized his neighbor's apartment. One of the handguns was a nine-millimeter model, which Bethea gave to Burno. [Burno] also explained that, in April of 2003, when he took his ex-wife, Michele Wright, medicine for their daughter, he stole a .38 caliber handgun from underneath Ms. Wright's bed. Burno claimed he drove Bethea to Juarbe's residence on the night in question in order to trade the .38 caliber handgun for drugs and money, and he remained in the car at all times. Burno further claimed in his taped statement that he heard two gunshots and then saw Bethea emerge from Juarbe's residence with a leg wound. Burno asserted [that] he disposed of the stolen guns after he transported Bethea to the hospital in Philadelphia.

On September 26, 2003, Burno gave a third statement to police in which he confessed that he and Bethea went to Juarbe's residence to rob him of drugs and money. In this third statement, Burno admitted [that] he entered Juarbe's residence, [that] he struggled with Rosado, and [that] he shot Rosado in the bedroom with the nine-millimeter handgun. This version was consistent with the trial testimony of David Rawlins, a jailhouse informant who testified pursuant to a plea deal that Burno had provided him with a detailed account of the murders. According to Rawlins' testimony at Burno's trial, Burno claimed that he came to Bethea's aid after Bethea was shot in the leg and he shot Rosado after Rosado dropped to his knees, pleading for his life. Moreover, while jailed in the Lehigh County Prison, Burno made several telephone calls, which were recorded, admitting to his ex-wife and an acquaintance, James Alford, that he was involved in the shootings.

Dr. Samuel Land, a forensic pathologist who performed an autopsy on Rosado, testified that Rosado died of a gunshot wound to the head. The bullet entered his left ear and then severed the jugular vein and carotid artery as it proceeded downward into the body. Based on the trajectory of the bullet, Dr. Land opined that the gunman was above Rosado at the time of the shooting. Another forensic pathologist, Dr. Sara Lee Funke, performed an autopsy of Juarbe, and she observed eleven gunshot wounds, three of which were fatal chest wounds. Dr. Funke recovered from Juarbe a total of five bullets, which were of two different types. She testified that the first type was a leaded, non[-]jacketed projectile, which entered Juarbe from both contact and non-contact wounds, as indicated by the presence or absence of injury to the skin surrounding the point of entry. She concluded that the contact wounds and the positions and trajectories of their entries were consistent with a struggle between the victim and the assailant. She further testified that the second type of bullet recovered from Juarbe, the jacketed ammunition, did not enter through a

contact wound. Finally, she noted that, in considering the trajectory of the bullets, with regard to at least one of Juarbe's wounds, the shooter was elevated higher than Juarbe.

A ballistics expert, Pennsylvania State Police Sergeant Eric Wolfgang, analyzed the ammunition recovered from the scene and concluded [that] two guns were utilized during the shootings inside of Juarbe's residence. He testified that the jacketed bullets came from a nine-millimeter handgun and the non[-]jacketed bullets were a .38 Special multi-ball type of ammunition, which was compatible with the gun Burno had stolen from his ex-wife.

Burno took the stand in his own defense and recounted the sequence of events contained in his second police statement, *i.e.*, he claimed that he gave the stolen .38 caliber handgun to Bethea and remained in the car at all times. He claimed [that] he did not know [that] anyone had been killed inside of Juarbe's residence until the next day when he saw a news report about the shooting. Burno maintained [that] he gave a false statement implicating himself in Rosado's murder because he was afraid of the death penalty, and his attorney warned him that Bethea would likely blame him for both murders. In rebuttal, the Commonwealth produced a fourth statement made by Burno that had been previously suppressed by the trial court on Sixth Amendment grounds. This fourth statement contradicted Burno's trial testimony and indicated that Burno had, in fact, shot both Juarbe and Rosado.

At trial, James Alford, the acquaintance to whom Burno had confessed in the recorded prison telephone call, denied any knowledge of Burno's involvement in the shootings. However, Alford admitted that, on April 13, 2003, the night of the murders, he received a telephone call from Burno asking if he could borrow Alford's vehicle, which was larger than Burno's vehicle, to take Bethea to the hospital. Alford described how they exchanged vehicles. Alford acknowledged at trial that he subsequently gave a taped statement to police in which he indicated that, when the men exchanged vehicles on April 13, 2003, Burno admitted to his participation in the death of Juarbe and Rosado. However, at trial, Alford contended [that] his statement to police was "fabricated."

The Commonwealth additionally introduced at trial testimony from Bethea's neighbor, Paul DeMaria, who indicated [that] he had a nine-millimeter handgun, a stereo, and phone stolen from his home only days after informing Bethea that he would be out of town for a few days. Another neighbor, who lived with DeMaria, testified [that] she later observed the stereo and phone in Bethea's residence.

Commonwealth v. Burno, 94 A.3d 956, 959-62 (Pa. 2014).

At the conclusion of trial, the jury convicted Burno of two counts of first-degree murder. See 18 Pa.C.S. § 2502(a). The case proceeded to the penalty phase, during which the Commonwealth argued that three aggravating circumstances justified imposition of the death penalty: (1) Burno committed a killing in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); (2) Burno had a significant history of felony convictions involving the use or threat of violence to the person, id. § 9711(d)(9); and (3) Burno had been convicted of another murder committed at the same time as the offense at issue, id. § 9711(d)(11). Regarding the significant felony convictions aggravator, the Commonwealth introduced evidence of Burno's prior convictions for robbery and conspiracy to commit burglary. Burno took issue with the use of his prior conspiracy conviction, maintaining that the crime did not involve the use or threat of violence to another person.

The jury found only one aggravator, that Burno had been convicted of another murder at the time of the offense at issue. The jury weighed that factor against the mitigating circumstances that it found pertaining to Burno's character and record and the circumstances of the offense, see 42 Pa.C.S. § 9711(e)(8) ("[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense"), and found that the aggravating factor outweighed the mitigating circumstances. Accordingly, the jury recommended two death sentences. On March 6, 2007, the trial court formally imposed the two death sentences.

On March 12, 2007, Burno's trial and penalty phase attorneys filed post-sentence motions. Therein, Burno alleged, *inter alia*, that the trial court had committed multiple errors and that Burno's sentence was excessive. Burno also argued that the verdict was against the weight of the evidence and that the trial evidence was insufficient to sustain his first-degree murder convictions. His attorneys also moved to withdraw as

counsel, and sought leave to amend or supplement the motions upon receipt of all transcripts. The trial court granted the motion to withdraw as counsel, and appointed a new attorney to represent Burno on appeal. Appointed counsel filed an uncontested motion for leave to file amended post-sentence motions, which the trial court granted. On May 28, 2008, counsel filed amended post-sentence motions in which counsel presented a number of additional claims, including multiple assertions that trial counsel was ineffective.

Following a three-day hearing, the trial court vacated Burno's judgment of sentence, and awarded him a new trial. Specifically, the trial court determined that trial counsel was ineffective for failing to object to certain portions of the prosecutor's closing argument. See Burno, 94 A.3d at 966-67. Because the court awarded Burno a new trial, it did not rule upon any of the other claims that he raised in his post-sentence motions.

The Commonwealth appealed the new trial award to this Court, and Burno filed a protective cross-appeal. We first considered the sufficiency of the evidence offered by the Commonwealth to prove Burno guilty of first-degree murder, an examination that we are obligated to undertake even though the trial court did not rule upon the sufficiency claim and even though neither party raised it before this Court. See Commonwealth v. Staton, 38 A.3d 785, 789 (Pa. 2012). In determining that the evidence was sufficient, our Court set forth the following analysis of the relevant evidence:

> [T]he Commonwealth presented evidence that, immediately after hearing gunshots fired from Juarbe's residence, Ms. Moyer saw two men flee from the area in a vehicle, which matched the description of a vehicle owned by Burno. Forensics determined [that] the blood trail, which led from Juarbe's residence to the spot where the vehicle had been parked, matched that of Bethea, who later implicated Burno. Uncontested forensics evidence revealed that bullets fired from two guns, including the type of gun [that] Burno had previously stolen from his ex-wife, were found at the scene and killed the victims. Dr. Land testified [that] Rosado died from a gunshot

wound to his head, and Dr. Funke testified [that] Juarbe suffered eleven gunshot wounds, including three fatal chest wounds. The Commonwealth presented evidence that Burno turned himself into [*sic*] the police and confessed to participating in the murders. Additionally, the Commonwealth presented evidence of confessions Burno had made to his ex-wife and Alford while using a county prison telephone, as well as the confession he had made to a jailhouse informant. Although Burno testified [that] he gave the gun, which he had stolen from his ex-wife[,] to Bethea, and he remained in his vehicle during the killings, the jury was free to discount Burno's testimony and to credit the ample evidence presented by the Commonwealth establishing Burno's identity as a gunman.

Burno, 94 A.3d at 969.

This Court then focused upon the propriety of the trial court's consideration of ineffective assistance of counsel claims on direct appeal. We noted that, at the time that the trial court reviewed the claims, that court did not have the benefit of this Court's decision in Commonwealth v. Holmes, 79 A.3d 562 (Pa. 2013). In Holmes, we held that courts should entertain claims of ineffective assistance of counsel on direct review only if there is good cause shown, and "the unitary review so indulged is preceded by the defendant's knowing and express waiver of his entitlement to seek PCRA[3] review from his conviction and sentence, including an express recognition that the waiver subjects further collateral review to the time and serial petition restrictions of the PCRA." Id. at 564. In light of this pronouncement from Holmes, we dismissed Burno's ineffective assistance of counsel claims without prejudice, effectively deferring them until collateral review.[4] We then remanded the case to the trial court to consider the claims that Burno

---

[3] Post Conviction Relief Act, 42 Pa.C.S. §§ 9541-46.

[4] Despite deferring Burno's claims, we nonetheless concluded that "deferral without commentary upon the ineffectiveness claims giving rise to the Commonwealth's appeal would be fruitless and may cause confusion." Burno, 94 A.3d at 972. Thus, "for the sake of clarity," we proceeded to address the merits of the ineffectiveness claim upon which the trial court granted relief, and concluded that the trial court had erred in its disposition. This discussion was *dicta*, and Justice Baer authored a concurring (continued…)

had raised in his post-sentence motions that did not implicate the effectiveness of trial counsel and that the court had not yet addressed. Burno, 94 A.3d at 978.

On remand, the trial court reviewed the remainder of Burno's issues, and determined that Burno was not entitled to relief. Consequently, by order and opinion dated September 28, 2015, that court denied Burno's motions. On October 14, 2015, Burno filed a notice of appeal. On the same day, the trial court directed Burno to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On October 23, 2015, Burno timely filed his concise statement. The trial court did not issue a separate opinion in response to Burno's concise statement. Instead, the court opted to rely upon its prior expressions, including the September 28, 2015 opinion that it issued in support of its decision to deny Burno's post-sentence motions.

Burno raises the following issues for this Court's consideration:

1. Did the lower court err in admitting [Burno's] September 26, 2003 statement to police as it was obtained by exploitation of the initial illegality in interrogating [Burno] minutes earlier in violation of his right to counsel?

2. Did the lower court err in admitting [Burno's] statement as it was made in the course of negotiations between the parties and was therefore inadmissible under Pa.R.E. 410?

3. Did the lower court err in admitting [Burno's] statement as it was obtained as the result of undue coercion by the prosecutor, who spoke privately with [Burno] in the midst of a post-indictment custodial interrogation when [Burno] was represented by counsel and then pressured him to confess?

4. Did the lower court err in admitting [Burno's] statement as it was obtained as the fruit of an illegal arrest?

---

(…continued)
opinion (joined by Justice Todd) distancing himself from that portion of the majority opinion.

5. Was the evidence of murder insufficient because the Commonwealth failed to prove that the decedents were lives-in-being before the events in question?

6. Did the trial court err in denying [Burno's] motion to dismiss under [Pa.R.Crim.P.] 600 where it took the Commonwealth 1,249 days to bring [Burno] to trial, a delay caused primarily by the Commonwealth's improper appeal of the lower court's ruling relegating the lead prosecutor to second chair?

7. Did the trial court err in allowing the Commonwealth to present aggravating evidence that [Burno] had previously been convicted of conspiracy to commit burglary where the facts and jury verdict in that case proved that there was no risk of personal violence and conspiracy itself is not a crime of personal violence?

Brief for Burno at 5.

Burno's first four issues concern the admissibility of the various statements that he provided to the police and to ADA Dantos. Our standard of review over such claims is well-settled:

> [O]ur initial task is to determine whether the [suppression court's] factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

Commonwealth v. Perez, 845 A.2d 779, 788 (Pa. 2004) (citation omitted). For ease of discussion, we consider Burno's issues in chronological order instead of in the order that his brief presents.

On or about September 12, 2003, Burno learned that the police wished to speak with him regarding the Juarbe and Rosado murders. Burno turned himself in to the authorities, and ultimately was arrested based upon an arrest warrant and a supporting affidavit of probable cause. Burno contends that the affidavit lacked sufficient probable

cause to justify his arrest, and, therefore, maintains that his subsequent confessions were fruit of the poisonous tree and should have been suppressed.

On September 13, 2003, Detectives Miller and Simock submitted an affidavit of probable cause in support of an arrest warrant for Burno. The affidavit contained twenty-one paragraphs detailing the detectives' investigation of the murders. The detectives described the scene of the crime, the recovery of the weapons and ammunition, and the location of the bodies when police first arrived. The affidavit included a summary of Ms. Moyer's initial reports to the police. The detectives explained that, through the use of DNA evidence, they had determined that Bethea had been present at the scene of the murders. They also learned that Bethea had checked himself into a Philadelphia hospital on the night in question to be treated for a shotgun wound.

Additionally, Detectives Miller and Simock noted that they spoke to another witness who had been in a romantic relationship with Juarbe. The witness told the detectives that she knew that Juarbe kept a sawed-off shotgun in his residence. She also noted that Bethea and Juarbe were friends and spent time together at a local bar. Bethea subsequently was arrested, and he implicated Burno for the first time. Bethea told police that Burno was inside Juarbe's residence at the time of the shooting, that Bethea had been wounded by a shotgun blast, and that he and Burno left the scene in Burno's vehicle. Bethea's wife, Kellyanne Meade, told the police that Burno and Bethea came to her apartment on the night in question. Burno informed her that Bethea had been shot. When she asked how he had been shot, neither Burno nor Bethea would provide her with any information or details about the shooting or the evening. The affidavit then reported that Meade informed the police that the trio drove to the hospital in a maroon-colored vehicle.

Burno asserts that the information contained in the affidavit falls short of probable cause, noting that only two of the twenty-one averments in the affidavit even mentioned him. He argues that the information contained within the four corners of the affidavit established only that he was present at the scene of the crime and that he departed after Bethea was shot. Nothing implicated him in the actual murders. The affidavit contained no details regarding what Burno actually did while at Juarbe's residence. Burno then argues that the police omitted a portion of Bethea's statement that exculpated Burno. Specifically, Bethea had told police that two other men entered the residence and shot and killed Juarbe and Rosado. Finally, Burno asserts that the detectives misrepresented Meade's statement to the police. According to Burno, Meade told the police that Burno and Bethea arrived at her house in a minivan and then drove to the hospital in another car, one owned by an individual named Prince Alford. According to Burno, Meade did not tell the police that they drove to the hospital in Burno's maroon vehicle. Burno notes that no physical evidence linked him to the murders, and asserts that the affidavit of probable cause established only that he was present at the scene, nothing more.

"There is, of course, no doubt that the issuing authority must have probable cause to believe a suspect guilty of a crime charged against him before issuing a warrant for his arrest. This is ancient law and basic to our concept of freedom." Commonwealth v. Krall, 304 A.2d 488, 489-90 (Pa. 1973) (citing Giordenello v. United States, 357 U.S. 480 (1958)). In determining whether probable cause exists, we apply a totality of the circumstances test. Commonwealth v. Clark, 735 A.2d 1248, 1252 (Pa. 1999) (citing Illinois v. Gates, 462 U.S. 213 (1983)). Probable cause to arrest exists when "the facts and circumstances within the police officer's knowledge and of which the officer has reasonably trustworthy information are sufficient in themselves to warrant

a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Commonwealth v. Gwynn, 723 A.2d 143, 148 (Pa. 1998) (citing Beck v. Ohio, 379 U.S. 89 (1964)). The question we ask is not whether the officer's belief was "correct or more likely true than false." Texas v. Brown, 460 U.S. 730, 742 (1983). Rather, we require only a "probability, and not a *prima facie* showing, of criminal activity." Gates, 462 U.S. at 235 (citation omitted).

We must construe applications for arrest warrants in a "common sense, nontechnical, ungrudging and positive manner." Commonwealth v. Baker, 615 A.2d 23, 25 (Pa. 1992) (citations omitted). In reviewing whether probable cause exists, we afford deference to a magistrate's finding of probable cause. Commonwealth v. Council, 421 A.2d 623, 628 (Pa. 1980). Finally, we note that the fact "[t]hat other inferences could be drawn does not demonstrate that the inference that was drawn by the police and the magistrate was unreasonable." Commonwealth v. Moss, 543 A.2d 514, 518 (Pa. 1988) (emphasis omitted).

Applying this standard to the information contained within the affidavit and the magisterial district judge's decision, we conclude that there was probable cause to justify the issuance of the arrest warrant. Burno is correct to assert that the affidavit was not rife with information implicating him as one of the murderers. However, Burno demands more from the affidavit than the law requires. The affidavit need only establish the probability that Burno was involved in the murders. The affidavit established without question that Juarbe and Rosado were murdered. The affidavit contained statements from Ms. Moyer, who indicated that she heard gunshots and saw two men fleeing the scene in a maroon car. Records discussed in the affidavit revealed that Burno owned a similarly colored car. The affidavit further set forth the forensic evidence that tied Bethea to the murders. Bethea, who was wounded in the leg during

the shootout, placed Burno at the scene of the crime, which also made it probable that Burno was one of the two men who fled the scene shortly after Ms. Moyer heard gunshots. There was no forensic evidence to suggest that any other perpetrators were present at the scene.

This information suggested more than Burno's mere presence at the scene. Burno's presence at the scene, plus the fact that two people were seen hastily fleeing the scene soon after the gunshots, plus Burno's assistance in Bethea's escape in a car belonging to Burno, plus Burno's unwillingness to discuss the events with Bethea's wife, collectively produce at least a probability that Burno was a participant in the murders. At a minimum, the information provided the magisterial district judge with a reasonable basis to conclude that Bethea did not act alone, and that it was probable that Burno was an accomplice, if not a principal actor.

Burno's assertions that the police omitted or misrepresented certain facts do not alter our probable cause determination. If a search warrant is based upon an affidavit containing deliberate or knowing misstatements of material fact, the search warrant is invalid, unless probable cause exists notwithstanding any deliberate omissions or misrepresentations of fact. See generally Franks v. Delaware, 438 U.S. 154, 155-56 (1978) (holding that a warrant must be voided if an affiant made a false statement knowingly and intentionally, or with reckless disregard for the truth, unless the affidavit's remaining content is sufficient to establish probable cause). Even assuming, *arguendo*, that the detectives omitted Bethea's statement that two other men committed the murder and misrepresented Meade's statements about which cars were used on the night in question, probable cause existed nonetheless. Bethea confirmed that Burno was present at the shootout during which Bethea was wounded, and that Burno helped Bethea escape from the scene of the crime. This information makes it probable that

Burno was involved at least as an accomplice. Bethea's self-serving exculpatory statements would not have negated that probability, nor were they supported by any evidence that the police had discovered. Additionally, even if Meade told the police that Burno and Bethea arrived and left in different vehicles, suggesting the presence of something other than a maroon vehicle, the affidavit still contained Ms. Moyer's statement that she saw two men leaving the murder scene in a maroon vehicle. As well, the affidavit set forth information connecting Burno to a vehicle of that color. Upon our deferential review, that information sufficed to support the probable cause finding. The alleged misrepresentations or omissions do not upset that calculus.

Next, Burno sets forth two challenges to the latter portion of his September 26, 2003 confession. First, he asserts that the confession was inadmissible because it was made in the course of plea negotiations, in violation of Rule 410 of the Pennsylvania Rules of Evidence. Second, he contends that the confession should have been suppressed because it was tainted by the illegality of the first portion of the conversation, which portion the trial court suppressed because it was obtained without Attorney Clark's presence. We address each contention in turn.

After he was arrested, Burno and his counsel indicated that Burno was willing to talk to the Commonwealth in reference to the murders. A meeting took place between Burno, his attorney, and ADA Dantos in the District Attorney's Office. Two detectives who participated in the investigation were also present. Suppression Hearing Transcript, June 2, 2004, (H.T., 6/2/04) at 36-37. The parties agreed that, in exchange for a truthful statement, a plea, and testimony against his codefendant, the Commonwealth would not seek the death penalty. Hearing Transcript, February 11, 2009, (H.T., 2/11/09), at 188, 193. On September 24, 2003, Burno gave his statement to police. Id. at 193-95. He claimed that he had no involvement in the killings and that

he merely waited outside the victims' apartment while co-defendant Bethea went inside and committed all the crimes himself. The Commonwealth did not believe Burno, and asked him to take a polygraph, which he failed. According to ADA Dantos, because Burno lied in his statement to the police, she told Burno that "he had no deal." Id. at 196.

On September 26, 2003, after Burno was told that he failed the polygraph, he grew very upset and broke down crying. He was very apologetic for lying and wanted, in ADA Danto's words, "to get back on board." Id. at 205-06. According to ADA Dantos, she told Burno: "you no longer have a deal, but you can work from here. Let's start from here. Give us the truth, testify and we will see where we are." H.T., 6/2/04, at 85. ADA Dantos also confirmed that Burno's attorney "was hopeful at that point that there was still room for something less than a death sentence" and that "his hope was to do the best for his client and try and get him some kind of deal, something less than death by getting him to tell the truth." H.T., 2/11/09 at 201-02.

Burno then gave a fully inculpatory confession without his attorney present, and then again with his attorney present. Nonetheless, on the day before his co-defendant's preliminary hearing, Burno told ADA Dantos that he no longer was willing to testify against Bethea. Burno told ADA Dantos that he did not believe there was any difference between life and death, because it did not give him "any light at the end of the tunnel, no hope for [his] future." H.T., 6/2/04 at 85-86. He stated to ADA Dantos, "I am going to roll the dice; take my chance at trial." Id. At that point, ADA Dantos informed Burno that "death is back on the table." Id.

Burno moved to suppress the second statement that he gave on September 26, 2003 (made when his attorney was present), on the grounds that it was made in the context of plea discussions. The trial court denied the motion to suppress, finding that

"at the time of the statement, negotiations had ended." Trial Court Order, April 6, 2005, at 2. The trial court explained: "The parties had reached an agreement . . . and thus had entered the performance phase of their contractual arrangement. Accordingly, [Burno] could have held no reasonable expectation that the statement was uttered only in the course of negotiations." Id.

Before this Court, Burno argues that the trial court erred in admitting his statement as it was made in the course of negotiations and, therefore, inadmissible under Pa.R.E. 410(a)(4).

Pa.R.E. 410(a)(4) precludes the admissibility of "a statement made during plea discussions with an attorney for the prosecuting authority if the discussions did not result in a guilty plea or they resulted in a later withdrawn guilty plea." The rule bars admission of the defendant's offer to plead guilty, the plea agreement, or statements made in the course of plea negotiations when no guilty plea is subsequently entered or if entered is withdrawn. This prohibition "makes obvious sense. A contrary rule would discourage plea negotiations and agreements, for defendants would have to be constantly concerned whether, in light of their plea negotiation activities, they could successfully defend on the merits if a plea ultimately was not entered." 5 Crim. Proc. § 21.2(h) (4th ed.) (footnotes omitted).

Not every statement making reference to a deal or omission of jail time is necessarily a plea discussion for purposes of this rule. Hutto v. Ross, 429 U.S. 28 (1976). First, the accused must exhibit an actual subjective expectation to negotiate a plea at the time of the discussion; and second, the accused's expectation must be reasonable given the totality of the circumstances. Commonwealth v. Calloway, 459 A.2d 795, 800-01 (Pa. Super. 1983) (adopting the Fifth Circuit's two-tiered analysis in U.S. v. Robertson, 582 F.2d 1356 (5th Cir. 1978), for determining whether plea

negotiations are underway). In <u>Commonwealth v. Vandivner</u>, 962 A.2d 1170, 1181 (Pa. 2009), we observed that "the very word negotiation posits the participation of two parties and not unilateral conduct," and specifically declared that:

> Of primary importance in assessing an accused's subjective expectation of negotiating a plea is whether the Commonwealth showed an interest in participating in such discussions. In line with this reasoning, voluntary, unsolicited statements uttered by an accused to authorities cannot be said to be made in furtherance of striking a plea bargain.

<u>Id.</u> at 1181. <u>Vandivner</u> provides an example of an accused's statement that was not protected by Pa.R.E. 410, because there was no evidence that the Commonwealth showed an interest in participating in plea discussions at the time the accused gave his inculpatory statement.

James Vandivner ("Vandivner") shot his estranged girlfriend and her son in front of several eye-witnesses and fled into the woods. After he was apprehended and while he was being taken into an interview room, Vandivner blurted out to State Troopers "This is a death penalty case. I don't want the needle. Life for life. Tell the [district attorney] I will plead guilty to life. I would have killed myself if I knew Michelle was dead." <u>Id.</u> at 1180. Prior to trial, Vandivner sought to suppress the statements that he made to the troopers. He argued that his statements were intended to "initiate plea negotiations;" therefore, they were inadmissible under Pa.R.E. 410(a)(4). <u>Id.</u> at 1181. The trial court found that Vandivner's voluntary, unsolicited statements to the troopers were not made in furtherance of striking a plea bargain. On appeal, this Court found that the trial court did not abuse its discretion, explaining:

> Here, there is no allegation by appellant, nor is there any evidence in the record suggesting that, at the time of appellant's statement, when he had just been apprehended for a murder witnessed by several people, the Commonwealth had conveyed any interest in negotiating a plea. Appellant's statement was a voluntary, unsolicited confession to the State Police troopers, not a statement made in furtherance of non-existing plea

negotiations. Thus, the trial court did not abuse its discretion in denying appellant's motion *in limine*.

Vandivner, 962 A.2d at 1181-82. See also Calloway ("The Commonwealth neither compelled the appellant to come forward nor exhibited a willingness to enter into plea negotiations with him.").

In Commonwealth v. Stutler, 966 A.2d 594 (Pa. Super. 2009), the Superior Court was faced with a different scenario, one more analogous to the present case. There, while in the custody of Pennsylvania State Police regarding a charge of receiving stolen property, John Stutler ("Stutler") stated that "he would be willing to cooperate with the Commonwealth" on unrelated burglary and conspiracy charges, "if he would receive judicial consideration for his cooperation." Id. at 596-97. The troopers relayed Stutler's message to the district attorney who, in turn, authorized the troopers to communicate to Stutler her "plea bargain offer of county sentences for the stolen property charge and the [burglary and conspiracy] charges" and "immunity for information regarding any other crimes in which Stutler had been involved." Id. at 597. The troopers communicated the offer to Stutler, who then gave a statement fully admitting his participation in the burglary. Subsequently, Stutler recanted his agreement to cooperate, and the Commonwealth's offer of county time was withdrawn. The trial court denied Stutler's motion to suppress, and the jury found him guilty of all charges.

On appeal, Stutler argued that the trial court erred in failing to suppress his confession pursuant to Pa.R.E. 410(a)(4), because it was made in the course of plea discussions. With respect to whether Stutler exhibited an actual subjective expectancy that his statements were made in regard to plea negotiations, the Superior Court found relevant the trooper's testimony that Stutler told him that he was willing to cooperate with the Commonwealth if he would receive judicial consideration in return. The Superior Court found Stutler's subjective expectancy was reasonable, noting that Stutler

refused to give his statement until he received leniency, and only confessed after the trooper communicated the district attorney's offer of county time for his cooperation. Id. at 600.

The Superior Court distinguished Calloway, finding that Stutler's inculpatory statement to the trooper was neither voluntary nor unsolicited. The Superior Court emphasized that at the time he gave his statement, he was under arrest, and he made his statement in response to the district attorney's offer of county time in return for his cooperation. Id. at 601. Finding that the Commonwealth exhibited a willingness to enter into plea negotiations, the Court concluded that Stutler's statement was made during plea negotiations, and that under Pa.R.E. 410(a)(4), the trial court erred in admitting it into evidence. See also Commonwealth v. Wolf, 510 A.2d 764, 767 (Pa. Super. 1986) (stating that "[if] the Commonwealth or a representative of the authorities had initiated the inquiry, or shown an interest in resolving the case short of trial, we would not hesitate to protect the accused's actions.").

Here, as in Stutler, the defendant had a subjective expectation that he was confessing as part of plea negotiations. Detective Wayne Simock, who testified on behalf of the Commonwealth, was present when Burno stated that he expected to receive something in return for his cooperation. Detective Simock testified:

> Q. At the time he gave the [second] statement, were there any conditions in terms of the status of these negotiations with the Commonwealth, in terms of his deal?
>
> A. He was still told that he still needed to testify; that the statement had to be the truth this time.
>
> ****
>
> Q. In this second interview where you have talked to Mr. Burno, what was his demeanor during the second interview?
>
> A. Concerned about his well being and what was going to happen to him. Time and time again he would make the comment that his life was in our

[J-63-2016] - 25

hands, and that his understanding was that with his cooperating, if he followed through with what we had asked him --

****

THE COURT: What did he say, Detective Simock?

A. That he believed with his cooperation, that the death penalty would be off the table, and that he would receive a life sentence.

H.T. 6/2/04, at 49.

The record also demonstrates that Burno's subjective expectation was reasonable. At the time he gave the statement, Burno was under arrest for two murders. He had just failed the polygraph. He was told that the original deal was off. He was surrounded by detectives and ADA Dantos. He was upset and concerned about facing the death penalty. His attorney was advising him to tell the truth in the hopes of obtaining something less than the death penalty. ADA Dantos then expressed her willingness to recommence plea negotiations, which were to begin with Burno making both a truthful statement and a promise to testify against Bethea.

Following these discussions, the parties did, in fact, reach a plea deal involving Burno's second confession on September 26, 2003. ADA Dantos testified that the deal she made with Burno in exchange for his confession was: "truthful statement, testimony [against Bethea], and in exchange for that we would take death off the table." H.T., 6/2/04, at 88. She also explained how, when Burno reneged on the deal and refused to testify at Bethea's preliminary hearing on September 28, 2003, "death [was] back on the table." Id. at 86. If Burno's statement was not made in furtherance of plea discussions, there would be no reason for ADA Dantos to place death "back on the table." For death to be placed "back on the table" there had to be a prior agreement to take it off. Viewing the totality of the circumstances, we conclude that Burno exhibited a subjective

expectation to negotiate a plea, and that his expectation was objectively reasonable. Burno's confession is the type of statement protected by Pa.R.E. 410(a)(4).

As this Court stressed in <u>Vandivner</u>, "of primary importance … is whether the Commonwealth showed an interest in participating in such discussions." <u>Vandivner</u>, 962 A.2d at 1181. Plea negotiations are "discussions in advance of the time for pleading with a view to an agreement whereby the defendant will enter a plea in the hope of receiving certain charge or sentence concessions." <u>Robertson</u>, 582 F.2d at 1365 (emphasis added). "Plea negotiations contemplate a bargaining process, a 'mutuality of advantage,' and a mutuality of disadvantage. That is, the government and the accused both seek a concession for a concession, a *quid pro quo.* The accused contemplates entering a plea to obtain a concession from the government. The government contemplates making some concession to obtain the accused's plea." <u>Id.</u> at 1366 (citations omitted).

When ADA Dantos stated to Burno, "Let's start from here" and "Give us the truth, testify and we will see where we are," she communicated to Burno that the Commonwealth was poised and willing to respond to Burno's cooperation with a concession of its own. It is clear that the Commonwealth elicited the confession that was utilized against Burno in the give-and-take of the negotiating room. Although ADA Dantos took the original deal off the table, she then encouraged Burno to confess and testify against Bethea, and in turn indicated that she was willing to participate in plea discussions. The promise made by ADA Dantos, vague though it was, prompted Burno to confess and ultimately resulted in a deal. There is no question that the Commonwealth was participating in plea discussions with Burno at the time that he confessed. This is the relevant inquiry under <u>Vandivner</u>. The fact that the terms of the

plea deal were not more concrete does not mean that the parties were not engaged in plea discussions.

Consequently, the trial court erred in concluding that negotiations were ended merely because the original deal had collapsed. The record clearly supports the conclusion that plea discussions remained ongoing at the time that Burno gave his second confession. Burno's confession should not have been admitted under Pa.R.E. 410(a)(4).

Nevertheless, the error was harmless. "Harmless error exists if the state proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict." Commonwealth v. Simmons, 662 A.2d 621, 633 (Pa. 1995)

The second ground for harmless error applies here. In Commonwealth v. Story, 383 A.2d 155 (Pa. 1978), this Court explained that under the "cumulative evidence" ground, three requirements must be met before a court may conclude that improperly admitted evidence was merely cumulative of other evidence presented:

> (1) There should be substantial similarity, in type of evidence and incriminating factual details, between the tainted evidence and the untainted evidence of which it is 'cumulative.' (2) The untainted evidence should be indisputable, either because the facts are in some way affirmatively accepted by the defendant or for other reasons. (3) Care should be taken that the 'untainted' evidence in no way derives from the tainted evidence.

Id. at 165.

Applying these requirements, a full review of this record shows that the tainted evidence (Burno's statements during plea negotiations) was substantially similar to the untainted evidence (his incriminating admissions during phone calls from jail). During his plea statement, Burno explained in detail how he and the co-defendant went to the victims' house on the night of the murders. Burno admitted that he shot one of the victims at least three times with a 9mm handgun. He also admitted to shooting the other victim. Commonwealth Trial Exhibit Nos. 76, 84-104.

At trial, the jury heard tape recordings of Burno's telephone calls made from the Lehigh County jail to his wife, Kimberly Burno, and to James Prince Alford. Notes of Testimomy ("N.T."), 3/1/07, at 478-84. During those conversations, Burno essentially repeated the same incriminating factual details he made during his plea statement. Specifically, he admitted to shooting one of the victims multiple times. He stated that he did not remember "how many times he shot the guy," though he believed it was "only . . . three times." He admitted that he had a 9mm handgun, and that he "deaded some people." He also acknowledged that he had already "copped to" or confessed to the murders. He placed himself at the scene of the murders, and talked about the guns he dismantled and disposed of after the crimes. He also attempted during those conversations to have his wife get in touch with his co-defendant Bethea to get their stories straight. He also acknowledged during one phone call that he knew the phone calls were being taped, but that he did not care. Commonwealth Trial Exhibit Nos. 124-130.

Further, the untainted evidence (Burno's incriminating admissions during phone calls from jail) was indisputable. There was no question at trial that he was the person on the tapes. The tapes were admitted into evidence without objection. N.T., 3/1/07, at 478-84. Finally, the untainted evidence in no way derived from the tainted evidence.

Because Burno's plea statement was merely cumulative of the same incriminating statements that he made during the phone calls from jail, admission of his plea statement was harmless error.

Burno next maintains that the latter portion of his September 26, 2003 confession was fruit of the poisonous tree. On that day, Burno spoke with Attorney Clark, who had given ADA Dantos and the detectives permission to commence re-interrogating Burno. It was during this confession that Burno for the first time admitted to participating in the murders. Burno told the police that the plan was for him to trick Juarbe into admitting him to the apartment, whereupon Burno would return briefly to his car. Then, he and Bethea would re-enter the apartment and rob Juarbe. Burno recounted that Juarbe thwarted this plan when he met them with a shotgun, which led to a struggle that resulted in Bethea getting shot in the leg. Burno admitted to shooting Juarbe and then struggling with Rosado, eventually shooting him as well. Attorney Clark was not present for this portion of Burno's statement.

After Attorney Clark arrived, however, Burno gave a second statement. During this discussion, the police often referenced statements that Burno made in the first statement, and noted that some details were slightly different. Burno maintains that the second portion of his statement, in effect, was a mere continuation of the first statement. The trial court suppressed the first portion of the statement because Attorney Clark was not present, but rejected Burno's fruit of the poisonous tree argument regarding the second portion of the statement.

The trial court's initial ruling that the first portion of the confession was inadmissible is not at issue in this appeal. Thus, we must assume for purposes of our analysis that the first portion was obtained by the police in violation of the Constitution.

The only question we consider is whether the second portion was unconstitutionally tainted by the first portion.

> [Not all evidence] is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at [*sic*] by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

Wong Sun v. United States, 371 U.S. 471, 488 (1963) (citation and quotation marks omitted). The relevant question is whether the confession "was sufficiently an act of free will to purge the primary taint of the unlawful confession." Id. at 486. "[A] defendant's exercise of his own free will in confessing will render his confession admissible, despite the fact that the confession would not have been obtained but for the [initial illegal act]." Commonwealth v. Shaw, 431 A.2d 897, 900 (Pa. 1981).

In Commonwealth v. Green, 581 A.2d 544 (Pa. 1990), we set forth some relevant factors for courts to consider when determining whether an original taint has been sufficiently purged, including: "(1) whether Miranda warnings were given; (2) the 'temporal proximity' of the illegal police conduct to the confession; (3) the presence of intervening circumstances or events; (4) the 'purpose and flagrancy of the official misconduct.'" Id. at 550-51 (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975)). Moreover, where confessions occur in brief succession, with the first one being illegally obtained, the prosecution must demonstrate facts "sufficient to insulate the [second] statement from the effect of all that went before." Clewis v. Texas, 386 U.S. 707, 710 (1967).

The initial illegality found by the trial court was Attorney Clark's absence, even though Attorney Clark gave permission for the interrogation. Otherwise, Burno had been advised of his Miranda warnings, and, by all other indications, was acting of his

own free will and was in no way coerced or compelled to act. Attorney Clark's appearance, and his consent to continue with the interrogation, very clearly suffices as an intervening event that removed the only taint found by the trial court and broke the chain of events so as to insulate the second statement from the first. Moreover, we note that, upon consideration of the last factor from Green, the police misconduct in this case does not appear to be purposeful or flagrant. Attorney Clark advised the detectives that they could interrogate Burno, and that they could begin doing so without Attorney Clark being present for the start of the interrogation.

That some substantive areas of the interview segments overlapped, and that the detectives at times referenced the earlier investigation, does not alter the fact that the taint was removed and that the confession was given as an exercise of Burno's own free will. See Shaw, *supra*. Burno's present protestations to the contrary notwithstanding, there is no evidence in the transcript of the September 26, 2003 confessions to suggest that the police coerced him into providing the second statement. Nor did the authorities force Burno to make admissions in the second statement only because he had made similar statements during the first statement. Moreover, even if there was some overlap between the two statements, Attorney Clark was present for the second statement to ensure that such statement was voluntary. The lawyer's presence purged any taint that resulted from the first statement, and refutes Burno's present claim that the second statement was fruit of the poisonous tree and should be suppressed.

In his final claim pertaining to his confessions, Burno asserts broadly that the totality of the circumstances rendered his September 26, 2003 confession involuntary. Those circumstances include Burno's prior two arguments regarding his belief that he confessed in the course of plea negotiations and that the confession used by the

Commonwealth was compelled by the prior, unconstitutional confession. Burno asserts as well that the confession was an involuntary product of coercion by ADA Dantos when she spoke to him after he had failed the polygraph test, knowing that he was represented by counsel and that counsel was not present. Finally, Burno argues that the polygraph examiner contributed to the overall coercion by instructing Burno that telling the truth generally is the best way to help oneself out.

Burno's claim fails. The governing consideration regarding the admissibility of a confession is voluntariness, which we determine based upon the totality of the circumstances. Commonwealth v. Nester, 709 A.2d 879, 882 (Pa. 1998). "The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess." Id.. "The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily." Id. Some of the factors that we use to determine the voluntariness of a confession include: "the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which may serve to drain one's powers of resistance to suggestion and coercion." Perez, 845 A.2d at 787 (quoting Commonwealth v. DeJesus, 787 A.2d 394, 403 (Pa. 2001)).

In this case, the totality of the circumstances demonstrates that Burno's actions were voluntary at every juncture, including the point at which he provided his ultimate confession. Burno had the assistance of counsel at every stage of the process. Attorney Clark was present to negotiate the initial deal with ADA Dantos that would have taken the death penalty off the table for Burno. Attorney Clark advised Burno to

provide a truthful statement, and was consulted before and after Burno took (and failed) the polygraph examination. Following some delay, ADA Dantos was able to reach Attorney Clark after Burno failed the test, whereupon Attorney Clark advised Burno to speak with the police and gave permission to begin the interrogation without him. Attorney Clark eventually arrived, spoke with Burno, and sat with Burno during the final confession. Throughout the process, the detectives provided Burno with Miranda warnings on three separate occasions. There is no indication that Burno failed to understand his rights, or that he was at any time unaware of his right to insist upon the presence of his attorney or of his right to remain silent. The record contains no indication that Burno was forced, or compelled in any way, to speak with the police.

None of the factors set forth in Perez were present here in a manner suggesting that Burno was coerced into confessing. Burno acted of his own free will and/or on the advice of counsel. None of the interrogations was extensive, nor were they performed in a way that debilitated or weakened Burno's psychological functions. There was no evidence that the police were threatening, abusive, or unduly coercive. This clearly was a collaborative effort by Attorney Clark and Burno to pursue a course of action that could result in a benefit to Burno. None of it was forced by ADA Dantos or the police officers.

The fact that ADA Dantos spoke with Burno without Attorney Clark's presence did not render the confession involuntary. ADA Dantos spoke with Burno after he requested to speak with Attorney Clark once Burno failed the polygraph test. ADA Dantos sought only to inform Burno that she was trying to contact Attorney Clark and that she was unable to reach him at that moment. Burno started crying and professing his regret for not telling the truth. It was Burno's conduct that spawned any discussions regarding the case. There is no evidence to suggest that ADA Dantos met with Burno

in an effort to extract a confession, or that she maneuvered to speak to Burno without Attorney Clark's permission or knowledge. More importantly, there is nothing about this interaction to suggest that the confession that Burno provided the police later was involuntary as a result of ADA Dantos' statements. She merely told him that he should tell the truth and that, if he did, she and the detectives would reassess the future of the case.

Similarly, after Burno had failed the polygraph test, he bemoaned to the polygraph examiner that his failure meant that no one could save him from the punishment he was facing. The examiner responded that telling the truth generally is one way in which a person could help himself. This lone statement hardly can be said to be coercive, let alone so unduly coercive that Burno's confession, which he made following Miranda warnings and after speaking with counsel multiple times, must be considered involuntary.

For these reasons, the trial court's rejection of Burno's numerous arguments, and its conclusion that Burno's confession constitutionally was admissible were not legal error.

In his next argument, Burno contends that the Commonwealth failed to prove beyond a reasonable doubt that either Juarbe or Rosado were lives-in-being before they were killed on the night in question. Burno maintains that, in order to prove a person guilty of first-degree murder, the Commonwealth must demonstrate that a human being was killed, which necessarily requires proof that the victim was alive before the charged conduct occurred. See Brief for Burno at 51 (citing Commonwealth v. Bracey, 662 A.2d 1062, 1072 n.13 (Pa. 1995)). Burno asserts that the Commonwealth offered no evidence to prove this essential element. "No witness was called to testify that he or

she saw either decedent alive at some point before the incident." Id. Hence, contends Burno, the evidence was insufficient as a matter of law to sustain the conviction.[5]

As with any sufficiency challenge, we must consider "whether the evidence introduced at trial and all reasonable inferences derived from that evidence, viewed in the light most favorable to the Commonwealth as verdict-winner, was sufficient to establish beyond a reasonable doubt all elements of first-degree murder." Commonwealth v. Sanchez, 82 A.3d 943, 967 (Pa. 2013). As noted earlier, we already reviewed the sufficiency of the evidence generally with regard to Burno's first-degree murder conviction. Presently, Burno challenges only whether the Commonwealth proved that Rosado and Juarbe were lives-in-being at the time of the crimes.

In order to convict a defendant of first-degree murder, the Commonwealth must prove beyond a reasonable doubt that a human being was killed unlawfully, that the defendant was responsible for the killing, and that the defendant acted with malice and with the specific intent to kill. See 18 Pa.C.S. § 2502(a); Commonwealth v. Johnson, 42 A.3d 1017, 1025 (Pa. 2012). Although the term life-in-being is rarely, if ever, listed as a specific point of proof, or as an element of murder, it is axiomatic that the victim must be alive before being killed unlawfully. The fault in Burno's argument is that he appears to believe that the only manner of proving this point is through a specific witness who takes the stand to testify to seeing the victim(s) alive during the time period immediately preceding the murder. This is simply incorrect. It is hornbook law that the Commonwealth may prove its case using wholly circumstantial evidence, and that circumstantial evidence can itself be sufficient to prove any or every element of the

---

[5] The Commonwealth characterizes Burno's argument regarding the adequacy of its proof pertaining to Juarbe and Rosado being lives-in-being as "utter nonsense." Brief for the Commonwealth at 42.

crime. Commonwealth v. Perez, 93 A.3d 829, 841 (Pa. 2014). The Commonwealth provided ample circumstantial evidence to prove that Juarbe and Rosado were living human beings before being murdered by Bethea and Burno.

Ms. Moyer testified to hearing loud voices and a sustained struggle emanating from Juarbe's apartment. She then heard numerous gunshots. When the police arrived, blood was splattered throughout the residence, and also formed a trail from the door of the residence to the spot where Burno's car was parked. There were shell casings from different guns strewn throughout the residence. The forensic testimony established that the victims were killed by gunshot wounds, and that marks on the bodies evidenced signs of struggle. Dr. Funke testified that one of Juarbe's gunshot wounds occurred while he was in the process of dying. Moreover, Bethea exited the residence with a gunshot wound to his leg that necessarily was caused by someone who was living at the time the wound was inflicted.

This circumstantial evidence, and the reasonable inferences drawn therefrom, clearly established that Juarbe and Rosado, who argued and fought with their assailants, and ultimately engaged in a shootout with them, were lives-in-being when Bethea and Burno entered the residence. To construe the evidence otherwise would defy common sense and rationality, and would require us to ignore our command to view the evidence in the Commonwealth's favor. There is no merit to Burno's argument.

In his sixth argument, Burno challenges the trial court's denial of his motion to dismiss the charges against him pursuant to Rule 600 of Pennsylvania Rules of Criminal Procedure. Burno notes that 1,248 days passed between the filing of the criminal complaint and his jury trial. Burno focuses his argument upon the approximate one-year time period that it took for the Commonwealth to litigate its appeal of the trial

court's decision to remove ADA Dantos from the lead prosecutor role. Burno maintains that the Commonwealth failed to establish that the Superior Court had jurisdiction over the appeal. Burno argues that the Commonwealth neither demonstrated that the order in question was an appealable collateral order pursuant to Pa.R.A.P. 313 nor that the order terminated or substantially handicapped its prosecution pursuant to Pa.R.A.P. 311(d). Burno points out that the Commonwealth entirely failed to certify the order for purposes of Rule 311(d). Regarding Rule 313, Burno challenges the Commonwealth's ability to satisfy the merits of each of the three prongs necessary to characterize an order as collateral for jurisdictional purposes.[6] The crux of Burno's argument is that, because the Commonwealth failed to establish the Superior Court's jurisdiction, the Commonwealth was unauthorized to file the appeal. As such, Burno urges, the Commonwealth did not act with due diligence, the time that it took to litigate the appeal should be held against the Commonwealth, and the charges against him should have been dismissed.

The Commonwealth agrees with Burno that the only contested time during the pre-trial proceedings is the period during which the Commonwealth sought, and litigated, its appeal. However, the Commonwealth maintains that the appeal was premised upon the Commonwealth's arguments, made in the notice of appeal and in its brief to the Superior Court, that the order in question was a collateral order. The Commonwealth asserts that the appeal was filed in good faith and was accepted and ruled upon by the Superior Court. As such, even though the Superior Court did not address whether the Commonwealth had satisfied each element of the collateral order

---

[6]    "A collateral order is an order separable from and collateral to the main cause of action where the right involved is too important to be denied review and the question presented is such that if review is postponed until final judgment in the case, the claim will be irreparably lost." Pa.R.A.P. 313(b).

doctrine, the Commonwealth maintains that the court nonetheless impliedly granted permission under that doctrine by disposing of the case on the merits. Consequently, according to the Commonwealth, the trial court did not abuse its discretion in denying Burno's Rule 600 motion.

We review a trial court's denial of a Rule 600 motion for an abuse of discretion. Commonwealth v. Solano, 906 A.2d 1180, 1186 (Pa. 2006). "An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will . . . discretion is abused." Commonwealth v. Wright, 961 A.2d 119, 142 (Pa. 2008) (citations omitted). "Our scope of review is limited to the record evidence from the speedy trial hearing and the findings of the lower court, reviewed in the light most favorable to the prevailing party." Commonwealth v. Selenski, 994 A.2d 1083, 1088 (Pa. 2010) (citing Solano, 906 A.2d at 1186).

"Rule 600 establishes a careful matrix protecting a defendant's rights to be free from prolonged pretrial incarceration and to a speedy trial, while maintaining the Commonwealth's ability to seek confinement of dangerous individuals and those posing a risk of flight, and to bring its cases in an orderly fashion." Commonwealth v. Dixon, 907 A.2d 468, 473 (Pa. 2006) (citing Commonwealth v. Hill, 736 A.2d 578, 580 (Pa. 1999)). Generally,

> Rule 600 serves to protect a defendant's speedy trial rights, as well as society's right to effective prosecution in criminal cases. Dixon, 907 A.2d at 473. To balance these rights, Rule 600(G) requires the court to consider whether the Commonwealth exercised due diligence, and whether the circumstances occasioning the delay of trial were beyond the Commonwealth's control. See Pa.R.Crim.P. 600(G). Further, the rule states, "If, at any time, it is determined that the Commonwealth did not exercise due diligence, the court shall dismiss the charges and discharge the defendant." Id.

Selenski, 994 A.2d at 1088 (citation modified).

A capital defendant must be brought to trial within 365 days of the filing of a complaint against him. Hill, 736 A.2d at 584. However, as a general rule, delays in bringing a capital defendant to trial that result from appellate resolution of pretrial motion rulings constitutes excusable time. See Commonwealth v. Boczkowski, 846 A.2d 75, 83 n.7 (Pa. 2004); Commonwealth v. DeBlase, 665 A.2d 427, 431-32 (Pa. 1995); Commonwealth v. Marconi, 567 A.2d 628, 630 (Pa. 1989); Jones v. Commonwealth, 434 A.2d 1197, 1200-01 (Pa. 1981). Such time is not calculated against the Commonwealth in ascertaining whether Rule 600 was satisfied, so long as the Commonwealth acted with due diligence at all relevant times. The Commonwealth bears the burden of proving due diligence by a preponderance of the evidence. Hill, 736 A.2d at 586. "Due diligence is fact-specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing that the Commonwealth has put forth a reasonable effort." Selenski, 994 A.2d at 1089 (citing Hill, 736 A.2d at 588).

In this case, it is evident that the Commonwealth acted with due diligence. The Commonwealth received an unfavorable ruling on a motion that was filed by Burno. The Commonwealth timely filed a motion for reconsideration of that order, and then a timely notice of appeal from the denial of that motion. In the notice of appeal, the Commonwealth set forth each of the elements of the collateral order doctrine, albeit without actually citing the rule itself. The Commonwealth plainly indicated in its notice of appeal that it was appealing the order as a collateral order. The Superior Court did not note the basis upon which it found jurisdiction. The Superior Court then ruled in the Commonwealth's favor.

From the record and the arguments, we discern no lack of due diligence on the Commonwealth's part. At all times, the Commonwealth pursued relief from an unfavorable ruling, and without unnecessary delay. Burno does not assert otherwise. Instead, Burno focuses upon the merits of the Superior Court's unclear jurisdictional determination. However, even assuming, *arguendo*, that Burno is correct in asserting that the court lacked jurisdiction (a claim upon which we express no opinion), that does not mean, *ipso facto*, that the Commonwealth did not act with due diligence. The Commonwealth believed that the Superior Court had jurisdiction, and asserted the basis for that jurisdiction in its notice of appeal. That the Commonwealth and the Superior Court may have been wrong, or that the Commonwealth's showing on the merits of the collateral order doctrine subsequently could be proven inadequate, does not equate to a lack of due diligence.

In sum, the time that it took to litigate the Commonwealth's appeal from the trial court's ruling constitutes excusable time, and we observe nothing to suggest that the Commonwealth did not act with due diligence. Hence, the trial court did not abuse its discretion in denying Burno's Rule 600 motion.

In his final argument, Burno challenges the trial court's decision to permit the Commonwealth to introduce Burno's prior conviction for criminal conspiracy to commit burglary in support of the aggravating factor that Burno had a significant history of prior felony convictions involving the use or threat of violence. See 42 Pa.C.S. § 9711(d)(9). According to Burno, the facts of the prior conviction demonstrated that no person was present at the time of the entry into the structure that resulted in the conviction, and, therefore, there was no risk of personal violence to anyone. As such, the conviction should not have been admitted in support of this aggravating factor.

Additionally, Burno points out that conspiracy, which was the crime for which he was convicted, is not a crime of violence inasmuch as it merely contemplates future criminal objects. The act that society seeks to punish is the nefarious agreement, which, by its very nature, cannot be a violent act, unless violence is used during the formation of the agreement itself. There is no evidence that such violence occurred. Despite the fact that the conspiracy charge did not itself recite a violent crime, the trial court nonetheless allowed the Commonwealth to submit the crime to the jury for consideration, in violation of the Eighth Amendment to the United States Constitution as well as the general proscription against allowing non-statutory aggravation evidence. See Brief for Burno at 64 (citing, *inter alia*, Commonwealth v. Diggs, 949 A.2d 873, 883-84 (Pa. 2008) (explaining that evidence was inadmissible that was irrelevant to any of the statutory aggravating circumstances that were advanced by the Commonwealth)).

Burno emphasizes that juries in Pennsylvania death penalty cases must weigh the aggravating circumstances against the mitigating circumstances before coming to a final decision. He maintains that, even though the jury did not find the (d)(9) aggravating circumstance beyond a reasonable doubt, it is nonetheless impossible to know whether the jurors relied upon that prior conviction in their deliberations, rendering the admission of that evidence sufficiently prejudicial so as to warrant a new penalty phase. Even if the evidence tainted only a single juror, Burno argues, prejudice resulted.

The Commonwealth responds first by highlighting the rule that burglary generally is considered to be a crime of violence. See Brief for the Commonwealth at 51-52 (citing, *inter alia*, Commonwealth v. Spotz, 47 A.3d 63, 104 (Pa. 2012)). Moreover, the Commonwealth notes that this Court previously has held that a jury may consider a conviction for conspiracy to commit another crime for purposes of the (d)(9) aggravator

in Commonwealth v. Rice, 795 A.2d 340, 349-50 (Pa. 2002) (plurality). Nonetheless, even if the evidence was inadmissible, the Commonwealth argues, its admission was harmless because the jury did not find the (d)(9) aggravator before it weighed the factors and reached its ultimate decision to recommend a death sentence.

The Commonwealth is correct that this Court previously has permitted the Commonwealth to introduce conspiracy convictions in support of the (d)(9) aggravator. For instance, in Commonwealth v. Reid, 626 A.2d 118, 122 (Pa. 1993), we summarily held that a conviction for conspiracy to commit murder was admissible for purposes of proving the (d)(9) aggravator. In doing so, however, we did not elaborate in any meaningful detail as to how or why conspiracy, which in effect is only an agreement, involves the use or threat of violence to another person. Of course, the object crime, murder in that instance, is a crime of violence. We did not explain how conspiracy nonetheless satisfied the language in the (d)(9) aggravator. We merely held that it did.

Similarly, in Rice, as the Commonwealth highlights, this Court upheld the admission of a conspiracy conviction for (d)(9) purposes.[7] Rice had challenged the trial court's admission of his prior conviction for conspiracy to commit robbery, arguing, as Burno does here, that conspiracy amounts only to a non-violent agreement with a co-conspirator and not to a violent crime. Rice, 795 A.2d at 349-50. Citing Reid, we held that the claim was "completely without merit." Id. at 350.

In Reid and Rice, we did not analyze in any substantive way the argument that conspiracy, which constitutes only a criminal agreement, cannot be considered a crime

---

[7]    The decision in Rice was a plurality because members of the Court could not reach a majority consensus on an issue pertaining to penalty phase jury instructions regarding victim impact evidence. No justices took issue with the lead opinion's resolution of the challenge to the admissibility of the conspiracy conviction for the (d)(9) aggravator.

of violence. Nor did we explain why the object crime of the conspiracy, if that object crime is a crime of violence, suffices to render the conspiracy itself admissible for purposes of the (d)(9) aggravating circumstance. Nonetheless, those cases remain binding precedent. We will not reconsider their wisdom, because, even if admission of Burno's conspiracy conviction was error, that error unquestionably would be harmless.

As noted above, Burno rejects the application of the harmless error doctrine in this case because, in his view, the fact that the jury received the evidence was sufficient to render the entire deliberative process infirm. We disagree. First, it is well-settled in Pennsylvania that errors with regard to evidence supporting the unpursued or unfound aggravating circumstances are subject to the harmless error standard. See generally Diggs, 949 A.2d at 884-85. Harmless error exists where:

> (1) the error did not prejudice the defendant or the prejudice was *de minimus*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

Commonwealth v. Hutchinson, 811 A.2d 556, 561 (Pa. 2002) (quoting Commonwealth v. Robinson, 721 A.2d 344, 350 (Pa. 1999)). Moreover,

> [a] death sentence will only be reversed if the jury relied on an unsupported and, therefore, improper aggravating circumstance in rendering its penalty phase verdict. Commonwealth v. Williams, 640 A.2d 1251, 1263 (Pa. 1994). However, **reversal of a defendant's sentence is not warranted by submitting an aggravating circumstance to the jury if the jury does not find beyond a reasonable doubt the existence of that improper aggravating circumstance in rendering its verdict of death since the error is harmless**.

Commonwealth v. Jones, 668 A.2d 491, 519 (Pa. 1995) (citation modified; emphasis added); see also Commonwealth v. Christy, 515 A.2d 832, 841 (Pa. 1986) ("The jury, to

its credit, however, did not find this aggravating circumstance. Therefore, the error committed by the trial court in submitting the evidence of burglary and escape charges did not prejudice the defendant.").

The jury in this case did not find the (d)(9) aggravator beyond a reasonable doubt, and, consequently, did not weigh that factor against the mitigating factor that the jurors found. Moreover, the fact of that conviction is in no way relevant to the aggravating circumstance that the jury did find (that Burno had committed another murder) and could not have prejudiced him in that regard. Thus, even assuming, *arguendo*, that Burno is correct that the trial court incorrectly permitted the Commonwealth to introduce the conspiracy conviction, any such error would be harmless, as no prejudice befell Burno. See Hutchinson, *supra*. Burno is not entitled to relief on this claim.

Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), we must affirm the sentence of death unless we determine that:

> (i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or
>
> (ii) the evidence fails to support the finding of at least one aggravating circumstance specified in subsection (d).

42 Pa.C.S. § 9711(h)(3). We have reviewed the record, and we conclude that the death sentence was not the product of passion, prejudice or any other arbitrary factor. The aggravating circumstance was supported by the record and by sufficient evidence. Burno was charged and convicted with two murders, satisfying the mandates of 42 Pa.C.S. § 9711(d)(11).

Accordingly, for this reason, and for the reasons set forth above, we affirm the judgment of sentence.

Justices Baer, Todd, Donohue and Dougherty join the opinion.

Chief Justice Saylor files a concurring opinion.