J-A30042-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                         :  PENNSYLVANIA
                                     :
              v.                       :
                                     :
ALVIN COLEMAN                      :
                                     :
              Appellant       :  No. 2916 EDA 2024

Appeal from the Judgment of Sentence Entered June 18, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004655-2023

BEFORE:  LAZARUS, P.J., PANELLA, P.J.E., and SULLIVAN, J.

MEMORANDUM BY SULLIVAN, J.:          **FILED MARCH 16, 2026**

Alvin Coleman ("Coleman") appeals from the judgment of sentence following his conviction for person not to possess.[1]  Because Coleman's sole appellate issue, in the nature of a Rule 600 challenge, merits no relief, we affirm.

The trial court provided the following overview of the factual and procedural history:

### 1. CRIMINAL ACT:

On March 11, 2022, at approximately 7:52 P.M. a Philadelphia Housing Authority (hereinafter "PHA") officer, Carl Hickey [("Officer Hickey")], was patrolling at 45th and Market Streets near the Westpark Apartments.  Officer Hickey was in his marked patrol car in a parking lot and "heard about 25 to 30 gunshots coming from behind me at, like, 400 Busti, 300 Busti area."

---

[1] *See* 18 Pa.C.S.A. § 6105(a)(1).

Officer Hickey reported gunshots fired over police radio in order to notify both Philadelphia Police and PHA Police. After a scan of the immediate outside area Officer Hickey waited for backup and then proceeded into the high-rise building located at 400 North Busti Street. Officers conducted a scan of the lobby, stairwells, and back door of the building but did not locate any gunshot victims or potential offenders. However, upon exiting the back door police located 28 fired cartridge casings.

The PHA dispatcher in contact with Officer Hickey, who has access to surveillance cameras at 400 North Busti Street, provided officers with flash information for the suspected offender. Police were then provided still images of the alleged offender from the surveillance camera. . . . [B]ased on this information and information from a PHA confidential informant, Philadelphia Police identified [Coleman] as the offender. [Detective Gregory Jara of the Philadelphia Police Department ("Detective Jara") obtained an arrest warrant for Coleman on March 22, 2022.]

**2. ATTEMPTS TO APPREHEND:**

After Philadelphia police identified [Coleman] as the offender, Philadelphia police officers and detectives attempted to arrest [him]. Multiple attempts to apprehend were made by members of the Philadelphia Police Department and the United States Marshal Service.

At [a later hearing on Coleman's motion to dismiss pursuant to Pa.R.Crim.P.] 600(A) . . ., State Parole Agent Ernest Jones [("Agent Jones")], who supervised [Coleman] between December 2020 and March 2022, testified that [Coleman's] parole was "maximum supervision" which required two in person contacts per month. One of these monthly contacts was required to be at [Coleman's] verified address on file at 336 North 53rd Street. The other location where Agent Jones frequently met with [Coleman] was Westpark Apartments at 400 North Busti Street, notably, where the March 11, 202[2], shooting occurred. Agent Jones testified at trial that his last contact with [Coleman] at 336 North 53rd Street was February 2, 2022, which was 37 days prior to the shooting. Agent Jones further testified that his last contact overall with [Coleman] was at 400 North Busti Street on March 2, 2022, which was 9 days prior to the shooting.

Detective [] Jara . . . was the assigned detective to the shooting case. In his capacity as the assigned detective, Detective Jara coordinated attempts to apprehend [Coleman] with the United States Marshal[] Service. On March 23, 2022, Detective Jara attempted to serve the arrest warrant on [Coleman] at both 336 North 53rd Street and 400 North Busti Street. [Coleman] was not present at either location.

On March 24, 2022, after being notified of the criminal charges and ongoing investigation by Southwest Detectives, State Parole Agent Jones went to [Coleman's] residence at 336 North 53rd Street. Upon entering the residence Agent Jones "established that [Coleman] was not at the residence and no longer had any belongings at that residence."

Detective Jara further testified that these coordination efforts with the United States Marshal Service included speaking to the United States Marshal Service on a monthly basis and receiving updates on their fugitive investigation. After each of these conversations with the United States Marshal Service Detective Jara entered notes into his investigation file regarding the United States Marshal Service updates.

Detective Jara testified as to these attempts to apprehend made by members of the United States Marshal Service. Specifically, according to testimony and notes entered by Detective Jara, multiple attempts to apprehend were made by detectives and the United States Marshal Service.

Th[e] court determined that attempts to apprehend were made on March 23, 2022, when police first attempted to serve the arrest warrant on [Coleman]. On March 29, 2022, a United States Marshal Service Task Force Officer obtained a court order authorizing disclosure of historical call data, mobile communication tracking data, and use of a trap and trace device. On April 7, 2022, a welfare account activity check was conducted on Appellant's account. On April 11, 2022, members of the Eastern District of Pennsylvania Violent Crime Fugitive Task Force conducted surveillance at two addresses Appellant was known to frequent. On May 5, 2022, a CLEAR [d]atabase search was conducted to determine potential new addresses for [Coleman]. On May 16, 2022, a United States Marshal Service Task Force Officer executed a court order to obtain call records believed to be associated with [Coleman]. On July 12, 2022, the Philadelphia

Police Department - Southwest Detective Division received a citizen tip regarding [Coleman's] whereabouts and shared this information with the United States Marshal Service's Fugitive Task Force. On July 19, 2022, the United States Marshal Service's Fugitive Task Force executed a court order on a Meta Platforms account.

[Coleman] was located and arrested by members of the United States Marshal Service in Johnstown, P[ennsylvania] on August 3, 2022. The arrest was . . . based upon the state parole detainer.

### 3. EXTRADITION:

After [Coleman's] parole arrest on August 3, 2022, [he] was extradited to Philadelphia on December 1, 2022. Detective Jara testified that this delay in extradition was because the state would not release [Coleman] to Philadelphia County until parole conditions were satisfied to make him releasable. Once [Coleman] was releasable an extradition request was made on October 24, 2022. On October 31, 202[2], Prisoner Transportation Service was contacted, and the pick-up of Appellant was arranged through this private company. This is the practice used by the Philadelphia Police Department whenever an extradition is required from another county according to Detective Jara's testimony. The request gained "final approval from the police department on November 8, 2022."

During this timeframe Prisoner Transportation Services was following COVID protocols. Because of these protocols [Coleman] was not extradited until December 1, 2022. Detective Jara testified, regarding the timing of [Coleman's] extradition to Philadelphia, that the Philadelphia Police Department:

> [W]as unable to have him brought to Southwest Detectives in Philadelphia until the state had finished their matters. And then once the state was finished with their matters, arrangements were made with the private prison company, and at that time, you're at the mercy of their schedule.

N.T. 1/5/24 at 67.

A preliminary hearing was scheduled for December 16, 2022, but was continued because a necessary police officer failed to appear. A second preliminary hearing was scheduled on January 5, 2023. At this hearing a necessary police officer was sick and failed to appear. On January 5, 2023, the Commonwealth withdrew charges as is the practice of the Philadelphia District Attorney's Office when not ready at two consecutive preliminary hearing listings.

Upon withdrawal of the charges on January 5, 2023, State Parole Agent Jones testified that [Coleman] was released from custody. However, because [Coleman] did not have a valid home plan "he was released to a parole halfway house, which was Gaudenzia DRC (Diagnostic and Rehabilitative Center), 3200 Henry Avenue." Given [Coleman] was still on parole, [his] release to Gaudenzia DRC required [him] to remain there until a valid home plan was established.

Charges were re-filed in the instant matter on January 16, 2023. A preliminary hearing was scheduled for February 7, 2023. Agent Jones further testified that on February 6, 2023, [Coleman] absconded from Gaudenzia DRC. Agent Jones stated that under the "statistical code that [State Parole Supervision will] utilize to identify offenders . . . [Coleman] would be listed as . . . a 29 . . . [which represents] an absconder." After absconding from Gaudenzia DRC on February 6, 2023, in violation of parole conditions, [Coleman] was rearrested in Johnstown, PA, on May 31, 2023. [Coleman later filed a Rule 600 motion, after which the trial court held a hearing and ultimately denied the motion.]

* * * *

On April 5, 2024, [Coleman] was found guilty[,] after a jury trial[,] of possession of firearm prohibited. . .. On June 18, 2024, th[e] court sentenced [him] to ten to twenty years of . . . incarceration . . .. On June 26, 2024, [Coleman] filed a post-sentence motion . . .. The . . . motion was denied by operation of law on October 28, 2024. . . . [Coleman] timely filed [a] notice of appeal . . .. [T]he court ordered [Coleman] to file a statement of errors complained of on appeal[, with which he timely complied].

Trial Court Opinion, 2/25/25 (unnumbered at 2-7) (some paragraphs re-ordered for clarity; some unnecessary capitalization and citations to the record omitted).

Coleman raises the following issues for our review:

1. Did the lower court err in overruling objections to the Commonwealth's inadmissible hearsay evidence at the Rule 600 hearing?

2. Did the lower court err and abuse its discretion when it denied [] Coleman's [Rule 600] motion . . . where the Commonwealth's lack of diligence resulted in more than 365 days of pre-trial delay?

Coleman's Brief at 2-3 (issues re-ordered for ease of disposition).

In his first issue, Coleman asserts the trial court erred in overruling his objections to what he asserts was hearsay evidence offered by the Commonwealth.[2]

Our standard of review for evidentiary issues is as follows: "We review such determinations for an abuse of discretion. An abuse of discretion is the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality, as shown by the evidence of record." ***Commonwealth v. Vance***, 316 A.3d 183, 189 (Pa. Super. 2024) (internal citations, quotations, and brackets

_____

[2] Hearsay is defined as a statement that "(1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). ***See also Commonwealth v. Manivannan***, 186 A.3d 472, 482 (Pa. Super. 2018) (defining hearsay).

omitted), *appeal granted*, 332 A.3d 1182 (Pa. 2025). It is well settled that we may affirm a trial court's evidentiary ruling if correct on grounds other than those relied on by the trial court. **See Commonwealth v. Johnson**, 160 A.3d 127, 144 n.15 (Pa. 2017).

Coleman argues the trial court erred in admitting hearsay evidence, via Detective Jara, of efforts by the U.S. Marshals to locate him. **See** Coleman's Brief at 33. He argues that while, if properly admitted, efforts by federal authorities to locate him could have shown the Commonwealth's diligence, the evidence was improperly admitted, and, consequently, "the Commonwealth failed to prove its diligence before [] Coleman's eventual arrest." **Id**. at 35.

The trial court considered Coleman's argument and concluded that because the hearing on the Rule 600 motion was a pre-trial hearing, the rules of evidence were relaxed, and, consequently, it could consider hearsay evidence. **See** Trial Court Opinion, 2/25/25 (unnumbered at 15-20). The court likened a Rule 600 hearing to a preliminary hearing at which, consistent with our Supreme Court's decision in **Commonwealth v. McClelland**, 233 A.3d 717 (Pa. 2020), some hearsay is admissible for purposes of determining whether the Commonwealth has put on a *prima facie* case against a defendant.

The Commonwealth argues the evidence was not hearsay because it was admitted not for the truth of the matter asserted but to show its effect on

the listener; as such, it is not hearsay. **See** Commonwealth's Brief at 22 (citing, *inter alia*, **In re Shahan**, 631 A.2d 1298, 1304 (Pa. Super. 1993)).

Before we review these assertions of error on the merits, we must determine whether Coleman preserved them. **See** Pa.R.A.P. 302(a) (providing that issues cannot be raised for the first time on appeal). **See also Commonwealth v. Houck**, 102 A.3d 443, 451 (Pa. Super. 2014) (noting that a failure to make a timely and specific objection before the trial court at the appropriate stage of the proceedings will result in waiver of the issue).

Our review of the record discloses that Detective Jara offered testimony about the U.S. Marshals' attempts to apprehend Coleman, and he also put together a log of these attempts, introduced and admitted as Commonwealth's Exhibit C-6. As Coleman indicates in his appellate brief, he lodged a single hearsay objection during Detective Jara's testimony. **See** N.T., 1/5/24, at 45; **see also** Coleman's Brief at 33. The objection occurred the first time Detective Jara stated generally that, "Attempts . . . were made by members of the United States Marshal Service." N.T., 1/5/24, at 45. Commonwealth's Exhibit C-6 was not marked for identification until further in Detective Jara's testimony, and Coleman made no objection at that time. **See id**. at 46. Further, Coleman made no hearsay objection when Detective Jara began to flip through the report and explain in detail the various attempts by the U.S. Marshals to apprehend him. **See generally id**. at 46-51. The only objection Coleman made during Detective Jara's reading of, and reference to, the report

concerned whether the detective was reading from the report or refreshing his recollection. *See id*. at 49. When the Commonwealth moved to introduce Exhibit C-6 into evidence, Coleman made no objection, hearsay or otherwise. *See id*. at 50. Thus, Coleman failed to make a timely and specific objection to Commonwealth's Exhibit C-6. Accordingly, Coleman's hearsay challenge to Exhibit C-6 is waived for our review. *See* Pa.R.A.P. 302(a); *Houck*, 102 A.3d at 451.[3] Having settled Coleman's evidentiary challenge, we proceed to the merits of his Rule 600 issue.

In his second issue, Coleman asserts the trial court erred in denying his Rule 600 motion to dismiss the criminal charges against him.

_____

[3] In any event, we find persuasive the Commonwealth's argument that the evidence was non-hearsay, but offered for the effect on the listener. A Rule 600 analysis of whether police exercised due diligence in attempting to apprehend a defendant focuses on whether,

> considering the information available to the police, they have acted with diligence in attempting to locate the accused. Deference must be afforded the police officer's judgment as to which avenues of approach will be fruitful. In considering the information available to the police, we do not ask whether the police had available all the information they *might* have had available-in other words, whether they did all they *could* have done. Instead, we ask whether what they *did* do was enough to constitute due diligence.

*Commonwealth v. Laurie*, 483 A.2d 890, 892 (Pa. Super. 1984). Here, the evidence about the U.S. Marshal's attempts to locate Coleman established what information was available to Detective Jara, which pertains to whether he acted with due diligence based on the information available to him. *Cf*. *Commonwealth v. Rayner*, A.3d 1049, 1058 (Pa. Super. 2016) (evidence is not hearsay if "offered to show why the police took the investigation in the direction that they did, not for the truth of the matter asserted").

Our standard of review for Rule 600 claims is as follows:

Appellate courts "review Rule 600 decisions for an abuse of discretion[.]" ***Commonwealth v. Lear***, [] 325 A.3d 552, 557 (2024) (internal citations and quotation marks omitted). A trial court does not abuse its discretion when it merely makes an error of judgment. Rather, a court abuses its discretion if it misapplies the law or exercises judgment that is manifestly unreasonable or the result of partiality, prejudice, bias or ill-will. [***See***] ***Commonwealth v. Burno***, 638 Pa. 264, 154 A.3d 764, 793 (2017) (citation omitted). "Our scope of review is limited to the record evidence from the speedy trial hearing and the findings of the lower court, reviewed in the light most favorable to the prevailing party." ***Id***. (citation omitted).

***Commonwealth v. Walker***, 331 A.3d 43, 46 (Pa. Super. 2025), *appeal denied*, 343 A.3d 727 (Pa. 2025).

In relevant part, Rule 600 provides:

**(A) Commencement of Trial; Time for Trial**

(1) For the purpose of this rule, trial shall be deemed to commence on the date the trial judge calls the case to trial, or the defendant tenders a plea of guilty or *nolo contendere*.

(2) Trial shall commence within the following time periods.

    (a) Trial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed.

* * * *

**(C) Computation of Time**

(1) For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation.

- 10 -

\* \* \* \*

**(D) Remedies**

(1) When a defendant has not been brought to trial within the time periods set forth in paragraph (A), at any time before trial, the defendant's attorney, or the defendant if unrepresented, may file a written motion requesting that the charges be dismissed with prejudice on the ground that this rule has been violated. A copy of the motion shall be served on the attorney for the Commonwealth concurrently with filing. The judge shall conduct a hearing on the motion.

Pa.R.Crim.P. 600.

This Court has recently summarized the law relevant to Rule 600 motions as follows:

> The "mechanical run date" in a Rule 600 analysis falls 365 days after the complaint was filed. *See* [] *Lear*, [] 325 A.3d [at] 560[], citing Pa.R.Crim.P. 600(A)(2)(a)). Periods of delay caused by the Commonwealth when the Commonwealth has failed to exercise due diligence are included in the computation of time to commence trial; any other periods of delay, meaning any periods of delay the Commonwealth did not cause or not resulting from a lack of due diligence, are "excludable time" and "shall be excluded from the computation." *See Lear*, 325 A.3d at 560, citing Pa.R.Crim.P. 600(C)(1). Excludable time is added to the mechanical run date to produce an "adjusted run date," "which is the deadline for the Commonwealth to bring the defendant to trial under Rule 600.*" *See id*.

> Rule 600 serves the purpose of protecting both a defendant's speedy trial rights and society's right to the effective prosecution of criminal cases. *See Commonwealth v. Bradford*, [] 46 A.3d 693 ([Pa.] 2012). A Rule 600 analysis requires a court to consider whether the Commonwealth exercised due diligence and whether the circumstances causing the delay were beyond the Commonwealth's control. *See id*. If the Commonwealth has not committed misconduct to evade the accused's speedy trial rights, "Rule 600 must be construed in a manner consistent with society's right to punish and deter crime," because Rule 600 "was not designed to insulate the criminally

- 11 -

accused from good faith prosecution delayed through no fault of the Commonwealth." ***Commonwealth v. Carl***, 276 A.3d 743, 748 (Pa. Super. 2022)). Due diligence does not demand perfection but does require the Commonwealth to put forward a reasonable effort. ***See Bradford***, 46 A.3d at 697.

Excludable time includes, but is not limited to, delays caused by: 1) the suspension of Rule 600 during the COVID-19 pandemic, without regard to the Commonwealth's diligence, ***see Commonwealth v. Malone***, 294 A.3d 1247, 1251 (Pa. Super. 2023); 2) defense unavailability or continuance request; 3) the adjudication of a defendant's pretrial motion; 4) court congestion, judicial delay, or court transfer; and 5) the failure to bring a defendant to court from state custody.

***Commonwealth v. Robinson***, 339 A.3d 1030, 1035–36 (Pa. Super. 2025)

(footnote and some citations omitted).

Additionally, with respect to whether time is attributable to the Commonwealth and non-excludable, this Court has elaborated:

Our Supreme Court recently explained that the first sentence of Rule 600(C)(1) provides "the general rule" and establishes "two requirements that must be met for delay to count toward the 365-day deadline: (1) [the Commonwealth caused] the delay . . . and (2) the Commonwealth . . . failed to exercise due diligence." ***Lear***, 325 A.3d at 560 (citation and internal quotation marks omitted). The ***Lear*** Court clarified that ***"the causation analysis precedes the due diligence inquiry, and it is only when the Commonwealth both caused the delay and lacked due diligence that the delay is properly included in the Rule 600 calculation." Id***. at 560 n.7.

***Walker***, 331 A.3d at 46 (emphasis in original). It is the Commonwealth's burden to demonstrate due diligence by a preponderance of the evidence to avail itself of an exclusion under Rule 600. ***See Commonwealth v. Womack***, 315 A.3d 1229, 1239 (Pa. 2024).

Where the Commonwealth withdraws an original criminal complaint and re-files, the following principles are relevant for determining whether the Rule 600 time begins from the first or second complaint:

> If, for example, the Commonwealth withdraws the first complaint in an attempt to avoid an imminent Rule 600 violation and then re-files the charges in hopes of circumventing that rule, then the Rule 600 time for the second complaint will be calculated from the filing of the first complaint.
>
> However, if the Commonwealth is diligent in prosecuting a complaint, and if the complaint is withdrawn or dismissed because of factors beyond the Commonwealth's control, then the Commonwealth, upon re-filing the charges in a second complaint, is entitled to have the time under Rule 600 run from the date of that second filing. Accordingly, in cases of subsequent complaints, the law requires that Rule 600 courts evaluate whether the Commonwealth was diligent with respect to the initial complaint.

*Commonwealth v. Dixon*, 140 A.3d 718, 723 (Pa. Super. 2016) (quoting *Commonwealth v. Claffey*, 80 A.3d 780, 786–787 (Pa. Super. 2013)).

Lastly, periods of time when a defendant absents himself "despite duly diligent efforts by the police to locate him" must be "chalked up to unavailability and excluded" from the Rule 600 calculation. *Commonwealth v. Fisher*, 483 A.2d 537, 538 (Pa. Super. 1984). *Accord Commonwealth v. Barbour*, 189 A.3d 944, 956 (Pa. 2018) (a defendant's absence, from pre-trial proceedings at which his appearance is required, results in the time being excludable).

Coleman argues the trial court erred in using the date the second complaint was filed in January 2023 rather than the initial date in March 2022.

- 13 -

*See* Coleman's Brief at 15. He asserts, additionally, the following times were not excludable: the delay between his arrest on August 3, 2022 and his preliminary arraignment on December 2, 2022, *see id*. at 21; the period between the first and second preliminary hearing dates, *i.e.*, from December 16, 2022 through January 5, 2023, *see id*. at 24; the period between the preliminary hearing on February 2, 2023, at which Coleman did not appear allegedly because he lacked notice, and his arrest date on June 6, 2023, *see id*. at 27. Coleman concedes the trial court correctly calculated the remaining time. *See id*. at 28. Based on his calculations, Coleman asserts the adjusted Rule 600 date was June 28, 2023. *See id*. at 29. He asserts there were 534 days of includable time by the time he filed his motion. *See id*. at 31.

The trial court considered Coleman's issue and concluded it merits no relief. The trial court first concluded the Rule 600 computation should begin with the Commonwealth's re-filing of the complaint on January 16, 2023, which would put the mechanical run date on January 16, 2024, such that Coleman's filing of his Rule 600 motion in December 2023 was premature. *See* Trial Court Opinion, 2/25/25 (unnumbered at 14).[4]

_____

[4] The court additionally, in the alternative, reasoned that the initial complaint was filed on December 2, 2022, which is the date from which the Rule 600 computation could alternatively begin to run, notwithstanding that the criminal complaint was sworn out on March 22, 2022. *See* Trial Court Opinion, 2/25/25 (unnumbered at 9). From the December 2022 date, the trial court found several delays were excludable and ultimately placed the adjusted run date on May 12, 2024. *See id*. (unnumbered at 14).
*(Footnote Continued Next Page)*

Following our review, we conclude Coleman's Rule 600 issue merits no relief. We begin with the swearing out of the arrest warrant on March 22, 2022. *See* Warrant of Arrest, 3/22/22. The mechanical run date fell on March 22, 2023. We proceed to consider whether the Commonwealth exercised due diligence such that the Rule 600 computation should begin with the refiling of the complaint in January 2023.

Pennsylvania Department of Corrections Parole Agent Jones testified that at the time Detective Jara obtained an arrest warrant for Coleman in March 2022, Coleman was on parole, and up to March 2022, Agent Jones was Coleman's supervising parole agent. *See* N.T., 1/5/24, at 20. At the time, Coleman was on "maximum supervision," which required two face-to-face meetings a month. *Id*. at 22. The address on file for Coleman was on North 53rd Street. *See id*. at 21.[5] Between March 11, 2022 (prior to the issuance of the arrest warrant) and August 3, 2022, Agent Jones had no contact with Coleman. *See id*. at 24. More specifically, Agent Jones learned about the charges against Coleman on March 23, 2022, and the next day, on March 24, 2022, Agent Jones went to the North 53rd Street residence with a team,

_____

The Commonwealth indicates it is constrained to concede the trial court erred in concluding the complaint should be dated according to its docketing rather than when it was sworn. *See* Commonwealth's Brief at 14 n.1.

[5] One other location where Agent Jones would meet Coleman was "in the parking lot" of a residence on North Busti Street. *See* N.T., 1/5/24, at 21.

gained access to the residence, and learned Coleman was no longer there and his belongings were gone. *See id*. at 25. At no point between March 11, 2022 and August 3, 2022 did Coleman make contact with Agent Jones, notwithstanding it was Coleman's responsibility to let Agent Jones know of any changes of address within 72 hours. *See id*. at 27. Upon learning that Coleman had fled, Agent Jones "established delinquency," after which a warrant was issued for Coleman, and his case was transferred to the Fugitive Apprehension Unit, which works with the U.S. Marshal Service. *Id*. at 25. Prior to transferring Coleman's case to the fugitive unit, Agent Jones ran a search to make sure Coleman was not in custody in another jurisdiction. *See id*. at 36-37.

Detective Jara also attempted to serve the arrest warrant on Coleman. He testified that on March 23, 2022, he went to both the North 53rd Street and the North Busti Street addresses, and Coleman was not at either location. *See id*. at 44. Detective Jara, aware that the U.S. Marshals were searching for Coleman, took no further action, apart from logging attempts by the U.S. Marshals to locate Coleman.

The U.S. Marshals obtained Coleman's phone records on March 29, 2022, and discovered his phone service was terminated as of March 23, 2022. *See id*., Ex. C-6. On April 7, 2022, Coleman emptied his welfare funds access card of $318 and the card was deactivated later that month. *See id*. Also in April 2022, members from the Eastern District of Pennsylvania Violent Crimes

Fugitive Task Force surveilled two other locations Coleman was known to frequent, and did not find him. *See id*. A confidential informant later indicated Coleman had fled the Philadelphia area. *See id*. In May 2022, Detective Jara searched the CLEAR database to determine whether Coleman had new addresses. *See id*. Also in May 2022, the U.S. Marshals executed a search warrant to obtain call detail records, apparently to no avail; in July 2022, police obtained a citizen tip regarding Coleman's whereabouts, which they forwarded to the U.S. Marshals, who also that same month executed a court order on Meta Platforms, Inc. seeking information about Coleman. *See id*. Coleman was eventually apprehended on August 3, 2022 in Johnstown, Pennsylvania. *See* N.T., 1/5/24, at 51.

As noted above, our standard of review requires our examination of the evidence of record in the light most favorable to the prevailing party. *See Walker*, 331 A.3d at 46. The Commonwealth's burden at a Rule 600 hearing is to prove due diligence by a preponderance. *See Womack*, 315 A.3d at 1239. Where a defendant's whereabouts are unknown, the question is whether police, using the information available to them, did enough to constitute due diligence. *See Laurie*, 483 A.2d at 892. Relevantly, where a defendant makes himself unavailable, that time is attributable to him for Rule 600 purposes. *See Fisher*, 483 A.2d at 538.

Here, the evidence shows that from March 23, 2022 through August 3, 2022, Coleman fled from Agent Jones and Detective Jara and affirmatively

- 17 -

attempted to avoid apprehension by turning off his cell phone service. The time between March 22 and August 3, 2022 is 134 days.

Once Coleman was apprehended, Detective Jara was unable to have Coleman transported to Philadelphia for the case *sub judice* because he was not "releaseable" until the completion of his parole matters. N.T., 1/5/24, at 52. Notably, members of Detective Jara's Southwest Detectives Unit, filled out an extradition request on October 24, 2022. ***See id***. at 53-54. Police used Prisoner Transportation Services, a private company, to transport Coleman, but transport did not occur until December 1, 2022. ***See id***. at 52-53. Detective Jara testified that he had no control over when Prisoner Transportation Services picked Coleman up. We conclude that, in the light most favorable to the Commonwealth, it established by a preponderance Detective Jara's due diligence from at least the time he filled out the extradition request to the time Prisoner Transportation Services delivered Coleman, which is 38 days.[6]

_____

[6] Additionally, Coleman concedes the court properly excluded 11 days between the second preliminary hearing and withdrawal on January 5, 2023, and January 16, 2023, when charges were refiled, because the delay occurred on account of a sick witness unavailable for court. ***See*** Coleman's Brief at 25 (citing ***Commonwealth v. Walker***, 331 A.3d 43, 49 (Pa. Super. 2025)).

Coleman also rightly acknowledges the 80 days resulting from his demand for a jury trial which occurred for the first time on September 19, 2023, up through the filing of his Rule 600 motion on December 8, 2023, was excludable because the Commonwealth was "ready for trial and was obliged to wait because of a congested court calendar that did not allow for a jury trial to start
*(Footnote Continued Next Page)*

The total number of days between March 22, 2022 and the withdrawal of the criminal complaint on January 5, 2023 was 289 days. The excludable time, from the swearing out of the arrest warrant on March 22, 2022, through Coleman's flight and up to his apprehension on August 3, 2022, was 134 days. The time between when Detective Jara requested a transport for Coleman and when Coleman was transported, October 24, 2022 and December 1, 2022, was 38 days. Accordingly, the excludable time up to the withdrawal of the criminal complaint was 172 days, meaning the Rule 600 time attributable to the Commonwealth at that point was 117 days. Thus, the record supports the trial court's conclusion that the Commonwealth's withdrawal of charges on January 5, 2023 and re-filing on January 16, 2023 was not an attempt to avoid an **imminent** Rule 600 violation by withdrawing and re-filing the charges. **See Dixon**, 140 A.3d at 723. Accordingly, we conclude the trial court did not abuse its discretion in using the date of the re-filed criminal complaint, January 16, 2023, for purposes of the Rule 600 analysis. The applicable mechanical run date, accordingly, was January 16, 2024. Coleman filed his Rule 600 motion on December 8, 2023. Thus, it was premature. **See Commonwealth v. Brandt**, 337 A.3d 973, 981-82 (Pa. Super. 2025) (affirming denial of a prematurely filed Rule 600 motion where the adjusted run date was after the filing of the motion).

---

until January 9, 2024." Coleman's Brief at 28-29 (citing **Commonwealth v. Mills**, 162 A.3d 323, 325 (Pa. 2017)).

Having concluded Coleman's Rule 600 challenge merits no relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/16/2026