J-S42006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SAMUEL SWAVELY | : | |
| | : | |
| Appellant | : | No. 791 MDA 2025 |

Appeal from the Judgment of Sentence Entered May 13, 2025
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0003897-2023

BEFORE: OLSON, J., KING, J., and LANE, J.

MEMORANDUM BY OLSON, J.: **FILED: APRIL 7, 2026**

Appellant, Samuel Swavely, appeals from the May 13, 2025 judgment of sentence entered in the Court of Common Pleas of Berks County after Appellant was convicted, in a non-jury trial, of persons not to possess, use, manufacture, control, sell or transfer firearms (Count 1), firearms not to be carried without a license (Count 2), and possession of firearm with altered manufacturer's number (Count 3).[1] The trial court sentenced Appellant to an aggregate term of five to ten years' incarceration.[2] We affirm.

---

[1] 18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 6110.2(a), respectively.

[2] On Count 3, the trial court imposed a sentence of five to ten years' incarceration. On Count 1, the trial court imposed a sentence of two to five years' incarceration with the sentence set to run concurrently to the sentence imposed on Count 3. On Count 2, the trial court imposed a sentence of 3½ to seven years' incarceration with the sentence set to run concurrently to the sentence imposed on Count 3. Appellant was found not to be eligible for the

The record reveals that, on November 6, 2023, Appellant was arrested and charged with the aforementioned criminal offenses. On February 28, 2024, Appellant filed an *omnibus* pretrial motion seeking suppression of a handgun recovered from Appellant's person at the time he was arrested by law enforcement. The trial court conducted a hearing on Appellant's *omnibus* motion on April 16, 2024. Based upon the evidence presented at the suppression hearing, the trial court made the following findings of fact:

1. On November 6, 2023, Detective James Gresh [("Detective Gresh")] of the Reading Police Department was conducting video surveillance on an unrelated drug investigation. Detective Gresh has been with the City of Reading Police Department for [seven] years. He was watching the city cameras live at the intersection of [South] 8th Street and Chestnut Street [in Reading, Berks County, Pennsylvania.]

2. Detective Gresh observed [Appellant] walking in the [100] block [of 8th Street wearing a sweatshirt with a hood attached. Detective Gresh] could see the imprint of a handgun in [Appellant's] sweatshirt pocket. Detective Gresh knew [the individual who appeared in the video] to be [Appellant] based on [] previously [being] shown [Appellant's] picture as a person of interest[,] although [Appellant] was never charged with any offense. While Detective Gresh was watching the [live] camera [feed], he [searched for Appellant] on [the Pennsylvania Justice Network ("JNET")] to observe his [driver's] license photo[graph] and compare it to the person on the live camera [feed]. Detective Gresh also ran [Appellant's] criminal history, and [Appellant] was previously adjudicated delinquent for aggravated assault. He additionally pulled up the flex database, which says whether or not a person has

recidivism risk reduction incentive program, state drug treatment, or boot camp. Appellant was ordered to pay $50.00 in costs and awarded 201 days as credit for time served.

a concealed carry permit. There were no results, meaning [Appellant] did not have a permit to conceal carry [a concealed firearm].

3.  Detective Gresh watched [Appellant] on the live[-streaming camera] for a while. Then Detective Gresh, Detective [Timothy] Morris and Sergeant Niebel went to the location to talk to [Appellant. Appellant] was [found] sitting on the stoop at [a residence] on [South] 8th Street and leaning forward. Upon arrival, Detective Gresh and Detective Morris could see the imprint of the handgun in [Appellant's] front sweatshirt pocket as it was heavy and clearly pressed against the pocket. Detective Morris testified that he knows what a firearm looks like based on training and experience. Detective Morris could see the handgun when he went to detain [Appellant. Appellant] was detained as he did not have a license to carry a concealed firearm. The firearm was a Taurus 9mm handgun with an obliterated serial number.

Trial Court Statement of Findings of Fact and Conclusions of Law, 6/3/24, at 2-3. On June 3, 2024, the trial court denied Appellant's *omnibus* motion.

On April 8, 2025, Appellant was convicted, in a non-jury trial, of the aforementioned criminal offenses. On May 13, 2025, the trial court sentenced Appellant as detailed *supra*. This appeal followed.[3]

Appellant raises the following issue for our review: "Whether the trial court erred in denying the [*omnibus*] motion to suppress[?]" Appellant's Brief at 7 (extraneous capitalization omitted).

Our appellate standard of review of the denial of a motion to suppress:

_____

[3] Appellant and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

is limited to determining whether the findings of fact are supported by the record and whether the legal conclusions drawn from those facts are in error. In making this determination, this Court may only consider the evidence of the Commonwealth's witnesses, and so much of the witnesses for the defendant, as fairly read in the context of the record as a whole, which remains uncontradicted. If the evidence supports the findings of the trial court, we are bound by such findings and may reverse only if the legal conclusions drawn therefrom are erroneous.

Further, our review is limited to the suppression hearing record. With respect to a suppression court's factual findings, it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court [] is entitled to believe all, part or none of the evidence presented.

*Commonwealth v. Easter*, 331 A.3d 675, 679 (Pa. Super. 2025) (ellipsis omitted), *appeal denied*, 345 A.3d 1199 (Pa. 2025). "Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights." *Commonwealth v. Wallace*, 42 A.3d 1040, 1047-1048 (Pa. 2012); *see also* Pa.R.Crim.P. 581(H) (stating, "[t]he Commonwealth shall have the burden of going forward with the evidence and of establishing that the challenged evidence was not obtained in violation of the defendant's rights").

On February 28, 2024, Appellant filed an *omnibus* pre-trial motion that, *inter alia*, sought the suppression of physical evidence recovered from Appellant's person during, what Appellant characterized as, an illegal detention by law enforcement. *Omnibus* Motion, 2/28/24, at ¶¶7-8. In his motion, Appellant asserts that his arrest and subsequent seizure of physical

evidence, namely a handgun, from his person was conducted without reasonable suspicion and without a search warrant or probable cause. *Id.* at ¶8. Appellant further asserts that the search of his person, and specifically the pocket of his sweatshirt, exceeded the parameters of a lawful pat-down, was conducted without his valid consent or a valid search warrant, and was not conducted incident to a lawful arrest. *Id.*

In denying Appellant's *omnibus* motion, the trial court held that the interaction between the police officers and Appellant was a custodial detention. Trial Court Statement of Findings of Fact and Conclusions of Law, 6/3/24, at 5 ¶8. The trial court further stated that the live[-streaming camera] footage viewed through the camera system showed Appellant "with the handgun clearly outlined in the [sweatshirt] pocket" and Appellant was "observed on camera walking up and down the street with the [hand]gun in his [sweatshirt pocket]." *Id.* at 6 ¶14. Based upon its factual findings drawn from the evidence presented at the suppression hearing, the trial court concluded that probable cause to arrest Appellant emerged from the observations made during remote surveillance because "the [police] officers observed a concealed [hand]gun in [Appellant's] sweatshirt pocket[, the police officers] knew who [Appellant] was [and that] he did not have a conceal carry permit[, and the police officers] were aware [Appellant] was a person not to possess [a firearm] based on a prior adjudication for aggravated assault." *Id.* at 5 ¶8, 6 ¶14; *see also* Trial Court Opinion, 8/8/25, at 4-5.

The Fourth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and Article I, Section 8 of the Pennsylvania Constitution protect a person from unlawful searches and seizures.[4]  It is well-established that

> Fourth Amendment jurisprudence has led to the development of three categories of interactions between citizens and the police. The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention[,]" must be supported by a reasonable suspicion[.  An investigative detention] subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest.  Finally, an arrest or "custodial detention" must be supported by probable cause.

_____

[4] The Fourth Amendment provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV.   The Pennsylvania Constitution provides,

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA CONST. art. I, § 8.

*Commonwealth v. Ellis*, 662 A.2d 1043, 1047-1048 (Pa. 1995) (citations and footnote omitted); *see also Commonwealth v. Adams*, 205 A.3d 1195, 1199-1200 (Pa. 2019).

> A custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest. A custodial detention requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

*Commonwealth v. Dix*, 207 A.3d 383, 388 (Pa. Super. 2019) (citation, quotation marks, and brackets omitted), *appeal denied*, 217 A.3d 790 (Pa. 2019); *see also Commonwealth v. Hernandez*, 935 A.2d 1275, 1284 (Pa. 2007) (stating that, "[t]he police have probable cause where the facts and circumstances within the [police] officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed" (citation and original quotation marks omitted)). "In determining whether probable cause exists, we apply a totality of the circumstances test." *Commonwealth v. Burno*, 154 A.3d 764, 781 (Pa. 2017). "The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a probability, and not a *prima facie* showing, of criminal activity." *Id.* (citations and original quotation marks omitted).

At the suppression hearing, Detective Gresh testified that, on November 6, 2023, he was conducting long-range surveillance of the intersection of South 8th Street and Chestnut Street through use of the city's safety unit

camera system. N.T., 4/16/24, at 10. Detective Gresh explained that he was conducting the surveillance operation as part of a drug investigation, which was unrelated to Appellant. *Id.* While monitoring the live-stream camera footage, Detective Gresh observed Appellant, who he recognized. *Id.* at 11, 13. Detective Gresh stated that he became interested in Appellant's presence in the area because he observed "the outline of a handgun in [Appellant's] front sweatshirt pocket." *Id.* at 11, 20-21. Through a search of various databases available to law enforcement, Detective Gresh was able to confirm Appellant's identity and the fact that he was not eligible to possess or carry a concealed firearm. *Id.* at 13-16. Based upon his observations, Detective Gresh proceeded to Appellant's location with Detective Morris and Sergeant Niebel. *Id.* at 15, 27.

Detective Gresh stated that he was sitting in the front passenger seat of an unmarked police vehicle when the three law enforcement officers located Appellant, who was sitting on the entrance steps of a residence in the 100 block of South 8th Street. *Id.* at 15, 28. Detective Gresh testified that, from his position in the police vehicle, he was able to confirm the outline of a handgun in the front pocket of Appellant's sweatshirt that he previously observed in the live video footage. *Id.* at 29, 33.

Detective Morris testified that he was the driver of the police vehicle. *Id.* at 46. Detective Morris stated that, upon locating Appellant, "I stopped my vehicle, opened my door, approached [Appellant], said, keep your hands out of your pockets. Keep your hands out of your pockets." *Id.* at 48.

Detective Morris agreed that he was "yelling" his commands to Appellant to keep his hands out of his pockets. *Id.* at 52. Appellant further confirmed that, after exiting the police vehicle, the police officer was yelling for him to put his hands in the air. *Id.* at 56.

As he approached Appellant, Detective Morris observed a "heavy object" in the front pocket of Appellant's sweatshirt. *Id.* at 48-49, 53. Detective Morris was able to identify the "heavy object" as a firearm based upon his law enforcement training and his military service. *Id.* at 50. Detective Morris testified that "[w]hen I got up to [Appellant], I went to his left. I grabbed his wrist to detain him. When I did so, I looked down and you could see into the [sweatshirt] pocket that there was a handgun inside of it." *Id.* at 49, 53. Detective Morris stated that he observed the handgun in Appellant's pocket while Appellant was still seated and before the police officers "pull[ed] him to his feet[.]" *Id.* at 53. Detective Morris further explained that "Sergeant Niebel and [I] were the [police officers] who grabbed [Appellant's] arms and placed him in handcuffs." *Id.* at 50. Detective Morris informed Detective Gresh that he observed a handgun in the front pocket of Appellant's sweatshirt, and Detective Gresh seized the firearm. *Id.* Appellant testified that he did have a handgun in his sweatshirt pocket. *Id.* at 58-59.

We concur with the trial court, and the record supports, that the police officers had probable cause to believe Appellant was committing a crime at the time Appellant was arrested or became subject to a custodial detention. Based upon the totality of the circumstances, namely the observations by

Detectives Gresh and Morris prior to Appellant's arrest that he had a firearm located in the front pocket of his sweatshirt and the understanding that Appellant was not authorized to carry a concealed firearm, the police officers had probable cause, based upon specific and articulable facts, that Appellant was committing a criminal offense. Therefore, we discern no error of law or abuse of discretion in the trial court's order denying Appellant's *omnibus* motion to suppress the physical evidence recovered from his person.

Judgment of sentence affirmed.

Judge King joins this Memorandum.

Judge Lane concurs in the result.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/07/2026