J-A08013-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
BRIAN PARKER :
:
Appellant : No. 908 EDA 2025

Appeal from the Judgment of Sentence Entered January 17, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006244-2023

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, P.J.: **FILED APRIL 30, 2026**

Brian Parker appeals from the judgment of sentence, entered in the Court of Common Pleas of Philadelphia County, following a nonjury trial after which the Honorable Donna M. Woelpper convicted him of aggravated assault,[1] simple assault,[2] possessing an instrument of crime,[3] and recklessly endangering another person.[4] After careful review, we affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2702(a)(4).

[2] *Id.* at § 2701(a).

[3] *Id.* at § 907(a).

[4] *Id.* at § 2705.

On August 22, 2023, Parker, who works as a "hack,"[5] dropped a friend off at 58th and Walnut Streets after taking the friend to get his glasses fixed. *See* N.T. Nonjury Trial, 11/8/24, at 43, 44. After dropping off his friend, Parker stopped and sat outside of the Fresh Grocer grocery store located at 5601 Chestnut Street to get some fresh air. *Id.* at 9, 43. In video footage captured by Fresh Grocer's security camera, Parker is shown sitting outside the store on top of an orange traffic barricade talking to multiple people, including a security guard. *See* Defense Exhibit 1 (Exhibit D-1), at 14:02.[6] Around 4:30 p.m., a man later identified as Pelgie Dixon approached a friend of Parker's named Troy, who was standing next to Parker. *Id.* at 15:15. Dixon was wearing a backpack, as depicted in the video and testified to by Detective Clair. *See id.*; N.T. Nonjury Trial, 11/8/24, at 16.

_____

[5] Parker testified that a "hack" is like a taxi driver, stating that if someone needed a ride, he would "take them to their destination." *Id.* at 44.

[6] This video camera footage, along with footage from another angle, was moved into evidence by both the Commonwealth and Parker. *See* Exhibit List, 11/8/24. However, Parker admitted longer versions of both videos, which depict the events leading up to and after the incident, giving the events more context. *See* N.T. Nonjury Trial, 11/8/24, at 13. Because Parker's videos are longer and depict more of the events that took place, we refer to these videos (marked as Defense Exhibit 2 (Exhibit D-2)) to describe the incident.

Additionally, Philadelphia Police Detective Christopher Clair testified as to both the Commonwealth and Parker's videos. *See id.* at 10-12; 13. The video has no audio.

Troy also works as a "hack," and he and Dixon exchanged a few words.[7] *See* Exhibit D-1, at 15:32- 16:25. Dixon then walked away. *Id.* at 16:25. About five minutes later, Dixon came back into the frame and again spoke with Troy. *Id.* at 20:48- 21:14; N.T. Nonjury Trial, 11/8/24, at 43-44. At that point, Troy walked away, and Dixon turned to Parker, who had been listening to and commenting on the conversation between Troy and Dixon. *See* Exhibit D-1, at 21:19; N.T. Nonjury Trial, 11/8/24, at 44. Dixon and Parker exchanged words, and eventually the conversation became heated. *See* Exhibit D-1, at 21:20- 21:57. Dixon appears to have walked away for a brief moment before re-approaching Parker, who was still sitting on the barricade. *See id.* at 22:00. At that point, Dixon punched Parker in the face, causing Parker to fall backwards off the barricade and hit his head on the ground. *Id.* at 22:05-22:08. Parker testified that he "was unconscious for a while," although the video footage shows him attempting to get back to his feet immediately after he hit the ground. *Id.* at 22:08; N.T. Nonjury Trial, 11/8/24, at 47. Dixon can then be seen saying something to Parker as Dixon walked away into the parking lot. *See* Exhibit D-2, at 1:41-1:43.

_____

[7] Dixon likely asked Troy for a ride based on Parker's trial testimony. *See* N.T. Nonjury Trial, 11/8/24, at 43. However, the Commonwealth eventually objected to those statements as hearsay, which the trial judge sustained. *Id.* at 44. These statements about the ride came before the statements that are at issue on appeal. Thus, for factual and evidentiary purposes, we do not speculate about the content of the conversation, we only note that words were exchanged. It is not until Parker attempted to testify as to threats that Dixon made towards him that the issue of hearsay becomes relevant to this appeal. *See infra*, at 4-5, 10.

Dixon then took his backpack off and Parker began to chase him through the parking lot. *Id.* at 1:44-1:46. Parker appeared to pull a gun out of his pocket and fire multiple times at Dixon as he tried to flee; as he ran away, Dixon stumbled multiple times. *Id.* at 1:47-1:56. After firing five shots, Parker turned around, jogged away, got into his vehicle, and drove off. *Id.* at 1:57-2:19; N.T. Nonjury Trial, 11/8/24, at 10. Dixon stayed in the parking lot while his friends checked on him; a police car then drove onto the scene and Dixon got into the back seat of the police vehicle. Exhibit D-2, at 2:20-4:07. Medical records revealed that Dixon sustained gunshot wounds to his left chest and left thigh. *See* N.T. Nonjury Trial, 11/8/24, at 35-36. Parker suffered injuries to his face, toes, and the back of his head. *Id.* at 51-53. Parker had a license to carry the firearm with which he shot Dixon. *Id.* at 36.

After the incident, Parker drove to his home located at 5858 Hazel Avenue. *Id.* at 32, 50. At approximately 5:12 p.m., Philadelphia Police Officer John Olesik responded to this address and found Parker sitting outside on the steps. *Id.* at 32, 50. Parker told Officer Olesik what had happened at the Fresh Grocer and handed over his firearm. *Id.* at 50. The police then took Parker down to the police station. *See id.* at 51.

Parker was charged with the aforementioned offenses. On November 8, 2024, a nonjury trial before Judge Woelpper was held, at which Parker testified in his own defense. *See id.* at 42. During his testimony, Parker attempted to explain that Dixon had been threatening him, but the Commonwealth objected on hearsay grounds:

Q. [] Now, let's move on back to you. When you did not give him a ride, what happened next[?]

A. He started telling me what he was going to do to me.

MR. FLYNN: Objection.

THE COURT: Sustained. You can't tell us what other people said. So let Ms. Latta ask you a question.

BY MS. LATTA:

Q. So[,] there was a communication between the two of you?

A. Yes.

Q. What happened next?

A. He started threatening me.

MR. FLYNN: Objection.

. . .

BY MS. LATTA:

Q. Just move on to what happened next, not what anybody said. Okay?

A. Yeah. Okay. When I told him I couldn't take him, he told me—

MR. FLYNN: Objection.

*Id.* at 45-46. This continued until Parker's counsel made the following argument:

Q. And what happened next?

A. Okay. I was unconscious for a while. I got up, and he was coming across. And he said he was going to—

MR. FLYNN: Objection.

THE COURT: Sustained.

MS. LATTA: So, Your Honor, at this particular point, I would argue that it's not being offered for the purpose of hearsay. It's being offered for the effect on the listener, Your Honor. And the relevance is, it matters what he believed when he

- 5 -

heard what he heard, what his state of mind is to what he had to do and what he did next. And this is a case, Your Honor, where the complaining witness is not even here. So[,] I don't have the ability [to] cross-examine, or get out in the [p]rosecutor's case in chief, any questions regarding anything about what happened between the two of them.

THE COURT: How do you respond, Mr. Flynn?

MR. FLYNN: Even if Mr. Dixon were here, his own statements would be hearsay. They are out-of-court statements. We have a video. Obviously, there is bad blood. Obviously, there are threats between these two gentlemen at the point where Mr. Parker arms himself. I still think those statements are inadmissible.

THE COURT: I agree. Objection sustained.

*Id.* at 47-48. The trial court found Parker guilty of all charges, deferred sentencing, and ordered the preparation of a presentence investigation. On January 17, 2025, the trial court sentenced Parker to an aggregate term of four years' probation. Parker filed a post-sentence motion on January 21, 2025, which the trial court subsequently denied on April 2, 2025. On April 7, 2025, Parker filed a timely notice of appeal, followed by a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Parker presents the following issue for our review: "Did the trial court wrongly preclude [Parker] from testifying to violent threats made by [Dixon], which were not offered for their truth but were directly relevant to showing [Parker]'s reasonable belief that he was justified in using deadly force in self-defense?" Appellant's Brief, at 2.

- 6 -

Parker contends that he should have been able to testify to the statements Dixon made before and after Dixon punched him, as the statements were not offered for their truth, but rather for their effect on Parker's state of mind. *Id.* at 8-9. This distinction, Parker contends, classifies the statements as non-hearsay, and thus, they should have been admissible to show that Dixon was threatening Parker's life, justifying Parker's use of deadly force. *See id.*

As this is a challenge to an evidentiary ruling, our standard of review is whether the trial court abused its discretion in excluding Parker's testimony. *See Commonwealth v. Lopez*, 57 A.3d 74, 81 (Pa. Super. 2012). "An abuse of discretion is 'the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will[,] or partiality, as shown by the evidence of record.'" *Commonwealth v. Lloyd*, 336 A.3d 1032, 1035 (Pa. Super. 2025) (citation omitted).

Hearsay is defined as "a statement that (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Pa.R.E. 801(c). Therefore, if a statement made by a declarant is not offered to prove the truth of the matter asserted, then it is not, by definition, hearsay. *See Commonwealth v. Busanet*, 54 A.3d 35, 56 (Pa. 2012). A common non-hearsay use of a statement made by a declarant is for its effect on the listener. "[W]here the statement is being offered to show its effect on a listener, it is

not being offered for the truth of the matter and is non-hearsay." ***Schmalz v. Mfrs. & Traders Trust Co.***, 67 A.3d 800, 803 n.3. (Pa. Super. 2013).

Parker sought to admit evidence of Dixon's statements in furtherance of his claim of self-defense. The justified use of force in self-protection is governed by 18 Pa.C.S.A. § 505, which provides that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). Conversely, the use of *deadly* force is not justified:

> [U]nless the actor believes that such force is necessary to protect himself against death, serious bodily injury, kidnapping[,] or sexual intercourse compelled by force or threat; nor is it justifiable if:
>
>> (i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or
>>
>> (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating, except the actor is not obliged to retreat from his dwelling or place of work, unless he was the initial aggressor or is assailed in his place of work by another person whose place of work the actor knows it to be.

***Id.*** at § 505(b)(2). The use of deadly force is defined as "force which, under the circumstances in which it is used, is readily capable of causing death or serious bodily injury." ***Commonwealth v. Mayfield***, 585 A.2d 1069, 1070 (Pa. Super. 1991) (citing 18 Pa.C.S.A. § 501). When an individual uses a gun to defend him or herself, the individual is determined to have employed deadly force. ***See Commonwealth v. Mouzon***, 53 A.3d 738, 753-54 (Pa. 2012)

(defendant used deadly force when he shot victim). The Commonwealth can refute a claim of self-defense by showing that the defendant escalated the altercation, or "used more force than reasonably necessary to protect against death or serious bodily injury." **Commonwealth v. Smith**, 97 A.3d 782, 788 (Pa. Super. 2014) (citation omitted).

Finally, the harmless error doctrine allows reviewing courts to overlook non-consequential errors that the trial court may have made if those errors would not change the outcome of the case and if it allows courts to "fulfill their societal duty to administer justice[.]" **See Commonwealth v. Taylor**, 309 A.3d 754, 774 (Pa. 2024). As our Supreme Court has stated:

> Harmless error exists if the state proves either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Burno**, 154 A.3d 764, 787 (Pa. 2017).

Here, in its Rule 1925(a) opinion, the trial court offers almost no analysis of the alleged hearsay statements themselves, instead asserting that Dixon's statements made to Parker "were unnecessary in light of the video evidence which clearly reflected heated words. . . . The [c]ourt simply did not need to hear the out-of-court threats to establish that [Parker] was in fear of his life." Trial Court Opinion, 5/30/25, at 7. After qualifying Dixon's statements as "unnecessary" and excluding them on hearsay grounds, the trial court wrote

that "[n]onetheless, if the [c]ourt's ruling were deemed erroneous, any such error would be harmless" in light of the video evidence presented at trial. *Id.*

While trial courts are permitted to exercise broad discretion in evidentiary rulings, and the statements made by Dixon in the instant case may have been "unnecessary," a trial court may not disregard otherwise relevant, admissible evidence, especially when it fails to conduct a Rule 403 analysis and determine whether the statements' prejudice outweighed their probative value. *See Commonwealth v. Dillon*, 925 A.2d 131, 136 (Pa. 2007) ("Typically, all relevant evidence, i.e., evidence which tends to make the existence or non-existence of a material fact more or less probable, is admissible, subject to the prejudice/probative value weighing which attends all decisions upon admissibility.") (citations omitted). Here, as Parker correctly points out, the statements that Dixon made to Parker shortly before and after Dixon punched him were not hearsay statements because Parker did not offer them for their truth. *See Schmalz*, *supra*. Instead, he offered the statements to demonstrate the effect that they had on his mental state, such as why he might have been fearful for his life.

This assertion is evidenced by one of the first instances where Parker attempts to describe his interaction with Dixon: "Q: Okay. . . . When you did not give him a ride, what happened next[?]; A: He started telling me what he was going to do to me." N.T. Nonjury Trial, 11/8/24, at 45. At this point, the Commonwealth objected to the statement as hearsay, and the objection was sustained. *See id.* This pattern of question, attempt to answer, and

- 10 -

objection continued for two more pages of testimony, until Parker's counsel argued that Dixon's statements were not being offered for their truth, but rather for their effect on Parker's state of mind. *See id.* at 45-47. In response, the Commonwealth asserted that, even if Dixon were in court to testify to his own statements, the statements would still be hearsay because they are out-of-court statements. *See id.* at 48. The court agreed, and the objections were sustained. *Id.*

However, as noted above, just because statements are made out-of-court does not make them hearsay; they must also be offered for the truth of the matter asserted. *See Busanet*, *supra*. Thus, the trial court misapplied the law in barring Parker from testifying about the alleged threats that Dixon made to him both before and after Dixon punched him. In incorrectly applying Rule 801(c), the trial court abused its discretion by excluding otherwise admissible testimony that was relevant to Parker's state of mind at the time of the incident.[8] *See Dillon*, *supra*. As a result, the trial court erred in prohibiting Parker's testimony about Dixon's alleged threats.

Nevertheless, we agree with the trial court that, regardless of whether Parker's testimony was improperly excluded, the Commonwealth presented overwhelming evidence to enable the court, as finder of fact, to conclude that

---

[8] Neither Parker nor the Commonwealth address the probative value versus prejudicial effect of Dixon's statements, likely because the trial court excluded them on hearsay grounds and never performed a Rule 403 balancing test. In any event, given our analysis, *infra* at 12, the balance between the statements' probative value and prejudicial effect is irrelevant to our ultimate determination. *See* N.T. Nonjury Trial, 11/8/24, at 45-48; Pa.R.E. 403.

Parker did not act in reasonable fear for his life. As Detective Clair testified, the video that captured the incident shows Dixon walking away from the grocery store after he punched Parker. *See* N.T. Nonjury Trial, 11/8/24, at 12. Thereafter, Parker "gives pursuit" while firing his gun at Dixon. *Id.* The fact that Parker pursued Dixon after Dixon walked away demonstrates that Parker was not acting in self-defense; rather, Parker was *escalating* the situation, *see Smith*, *supra*, which nullifies his self-defense claim.

Additionally, Dixon's bookbag, which held the alleged weapon that Parker claimed Dixon possessed and threatened him with, was not in Dixon's possession when Parker shot him. *See* N.T. Nonjury Trial, 11/8/24, at 23-24. Thus, even if Parker initially thought that he had reason to fear for his life, the video evidence, along with Parker's testimony that he believed Dixon's weapon was in his backpack, refutes Parker's belief that he was threatened with immediate harm at the moment he shot Dixon. *See id.* at 54-55; 18 Pa.C.S.A. § 505(a) (implementing immediacy requirement for justified force used in self-protection).

Finally, the trial court could reasonably have found, based on the video evidence, that Parker could have retreated into the grocery store. This would also undermine his claim of justified use of deadly force in self-protection. *See* 18 Pa.C.S.A. § 505(b)(2)(ii). The video showed Parker sitting outside of the Fresh Grocer, with no one behind him blocking his retreat into that store. *See* N.T. Nonjury Trial, 11/8/24, at 55-56. Although Parker had just been punched by Dixon, Dixon began to leave the scene, and instead of seeking

assistance from authorities, or retreating into the store where he likely would have been safer, Parker chose to actively pursue Dixon and discharge the weapon toward him. *See id.* at 11-12. This action clearly contradicts the purpose of subsection 505(b)(2)(ii), and, thus, Parker is not warranted in using deadly force in self-defense. As such, there was clear evidence that Parker did not act in accordance with the law, regardless of whether Dixon's statements caused Parker to fear for his life. Therefore, the trial court correctly concluded that any evidentiary error was harmless. *See Burno*, *supra.* Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/30/2026